STERN BROS., INC., *a Delaware Corporation*

HAROLD W. WILSON, *as Trustee,*

*and*

WOOD COUNTY BANK, *a West Virginia Banking Corporation*

*v.*

THE HONORABLE JAMES G. MCCLURE,

*Judge*

(No. 13902)

Decided July 12, 1977.

*James M. Sprouse, Julian H. Singman, Landis, Cohen, Singman & Rauh* for relators.

*Furbee, Amos, Webb & Critchfield, John D. Amos, Alfred J. Lemley, Rose, Schmidt, Dixon, Hasley & Whyte, Harold R. Schmidt, Karl Alexander* for Consolidation Coal Co. (real party in interest).

MILLER, JUSTICE:

In this original prohibition action, we consider questions as to the disqualification of judges, the scope of the Judicial Reorganization Amendment, and this Court's administrative powers as they relate to the disqualification of judges.

The prohibition sought by relators, Stern Bros., Inc., Harold W. Wilson as Trustee and Wood County Bank (herein relators), is based on the theory that the respondent, Judge James G. McClure, lacks jurisdiction to hear the underlying civil case to which relators are party defendants. The claim of lack of jurisdiction does not rest on any impropriety on the part of the respondent judge, but is centered solely on the manner in which he was selected to hear the case.

A history of the procedural background will serve to illuminate the problem. In 1971, relators were sued in the Circuit Court of Marion County by the Consolidation Coal Company. The object of the suit was to obtain partition of the undivided interest that the parties held in the Pittsburgh seam of coal.

Judge J. Harper Meredith of the Sixteenth Judicial Circuit presided over the litigation, which had moved through the Commissioner stage by June 1, 1976. On this date, relators through their attorneys filed a written motion before Judge Meredith that he disqualify himself. The basis of the motion rested on a number of

factual allegations involving real property transactions between Judge Meredith, his brother, and Consolidation Coal Company.

Judge Meredith heard the matter of his disqualification on July 8. Counsel for the parties were present and at the conclusion of the hearing, which consisted mainly of the Judge interrogating the relators' attorneys as to their investigation that produced the motion for disqualification, the Judge decided to recuse himself. Since there was another Circuit Judge in the Sixteenth Judicial Circuit, Judge Fred L. Fox, II, Judge Meredith directed that the case be taken to him.

At this point, Consolidation Coal Company's attorneys reminded Judge Meredith that Judge Fox was a former associate in their firm. This point was dismissed by Judge Meredith, who directed the case to Judge Fox and concluded the hearing.

Counsel for both parties then proceeded across the hall to Judge Fox's chambers and, on discovering he was absent, agreed that the attorneys for Consolidation Coal would contact Judge Fox as to a date for further hearing, since the Consolidation Coal attorneys were local and relators' attorneys were from Charleston.

Thereafter, the two groups of counsel exchanged correspondence in connection with a draft of a proposed order covering the matters involved at the hearing on the disqualification of Judge Meredith. On July 28, 1976, one of the attorneys for Consolidation Coal called relators' attorneys in Charleston and advised that Judge Fox was no longer in the case and that it had been assigned by Chief Justice Berry of this Court to Judge McClure. Counsel for relators by letter to Judge Fox made an immediate and detailed protest of the manner in which the transfer proceedings had been handled, with copies to Chief Justice Berry, Judges McClure and Meredith, and opposing counsel.

Thereafter, relators' counsel took the deposition of Judge Meredith to determine his role in the initiation of the transfer of the partition suit to respondent. From

the deposition, it appears that the attorneys for Consolidation Coal Company met with Judge Meredith without any prior notification to relators' attorneys.[1] At this meeting, Consolidation Coal Company's attorneys again advised Judge Meredith of Judge Fox's former association with their firm and that the genesis of the partition suit had occurred during his period of association.

At this point, Judge Meredith, according to his deposition, called the office of the Chief Justice of this Court in the presence of the Consolidation Coal Company attorneys. Contact was not made with the Chief Justice but with one of the employees of the Court, a Miss Ellen Warder. Judge Meredith advised Miss Warder that both he and Judge Fox were disqualified from participating in the partition case and requested that a judge from another county be assigned to the case.

In his deposition, Judge Meredith indicated that a short time after his initial call Miss Warder called back and gave him the names of three available judges, one of whom was the respondent judge. Judge Meredith indicated to her that respondent would be acceptable. The substance of Judge Meredith's recollection of the selection is confirmed by Miss Warder's affidavit attached to relators' petition. Miss Warder further stated that Chief Justice Berry was out of town on the day she accepted the call from Judge Meredith, but upon the return of the Chief Justice the following day she advised him of the matter, and an order was then entered by this Court appointing respondent.

Subsequently, on July 30, 1976, Judge Fox wrote Chief Justice Berry advising that he believed himself disqualified from handling the partition suit because of his prior association with the law firm representing Consolidation Coal Company.

The foregoing facts are not controverted by the re-

---

[1] Disciplinary Rule DR7-110(B) of the Code of Professional Responsibility, adopted by this Court on June 9, 1970, limits ex parte communications with a judge in adversary proceedings. The rule relates to communications as to the merits of the case.

spondent, nor by Consolidation Coal Company, which joined in the response as a real party in interest.

Relators' first claim is that once Judge Meredith decided to recuse himself, he had no further authority over the case. Consequently, his latter action on July 28 in determining that Judge Fox was disqualified and in calling this Court and assisting in the selection of a replacement judge were void acts, rendering the selection of the respondent, Judge McClure, invalid. The second contention is that this Court's administrative rule relating to the appointment of temporary judges was not followed and this also renders respondent's assignment invalid.

The first point goes to several aspects of the law regarding disqualification of judges, which in our State has not been fully developed. Under W. Va. Code, 51-2-8, there are set forth certain substantive grounds that are sufficient for disqualification of a judge.[2] This statute does not set out any procedural guidelines surrounding disqualification of judges.

As noted in 46 Am. Jur. 2d *Judges* § 217, some states have statutes governing the procedure in disqualifying a judge. Of particular concern is whether, upon the filing of a motion to disqualify, the involved judge should undertake to hear the merits of the motion. We do not find any decision by this Court that is directly in point, although *Fahey v. Brennan*, 137 W. Va. 37, 70 S.E.2d 438 (1952), suggests that a judge should not pass upon the merits of a motion for disqualification filed against him.

*Fahey* involved a situation where the circuit judge initiated disciplinary proceedings alleging malpractice against two attorneys. In turn, the attorneys sought a writ of prohibition in this Court to prohibit the judge from presiding over the disciplinary cases. It was the attorneys' theory that the judge "... was disqualified

---

[2] In addition to the statutory grounds for disqualification, this Court has recognized that bias and prejudice of a Judge may also constitute a ground. *Fahey v. Brennan*, 137 W. Va. 37, 70 S.E.2d 438 (1952).

by reason of the alleged hostility and hatred exhibited toward petitioners." This Court granted the prohibition preventing the judge from presiding over the cases.

It appears to be the general rule that a judge before whom a disqualification motion is filed should not hear the merits of the motion. *See, e.g., State ex rel. McNary v. Jones,* 472 S.W.2d 637 (Mo. App. 1971); *Peters v. Jamiseon,* 48 Hawaii 247, 397 P.2d 575 (1964); *State v. Kent,* 4 N.D. 577, 62 N.W. 631 (1895).

The reason for this rule is rather obvious. Without it, the judge is placed in the difficult position of attempting to judge a matter which involves him directly and personally. No man can be a judge in his own cause. *Findley v. Smith,* 42 W. Va. 299, 26 S.E. 370 (1896).

Procedures for appointment of a substitute judge were promulgated by this Court on May 29, 1975, in an administrative rule dealing with the temporary assignment of circuit court judges where a particular judge is disqualified from handling a case.[3] This rule was promulgated

---

[3] "ASSIGNMENT OF CIRCUIT JUDGES—Temporary assignments of circuit judges in accordance with Article 8, Section 3, of the Judicial Reorganization Amendment to the Constitution of West Virginia, may be made as follows:

"(1) A judge who is disqualified from handling a particular case or who desires the temporary assignment of another circuit judge to his circuit for any reason, should notify the Chief Justice *in writing* of this request and the reason therefor.

"(2) If the requesting judge has made preliminary arrangements with another judge to come into his circuit this fact should be set out in the letter to the Chief Justice.

"(3) The letter to the Chief Justice should contain all essential information such as the style and number of the case the requesting judge wishes the assigned judge to handle and any other matters that might be helpful to the Chief Justice in making the temporary reassignment.

"(4) The Chief Justice will draft a letter temporarily assigning a judge to the circuit court for the reasons set forth in the requesting judge's letter.

"NOTE: Only the demonstration of exceptional circumstances will warrant the temporary assignment of a judge of a 'foreign' circuit to a *multi*-judge circuit wherein a judge wishes to recuse himself from a case or cases. [Emphasis in original]

pursuant to the provisions of Article VIII, Section 3 of the *West Virginia Constitution*, commonly known as the Judicial Reorganization Amendment.

The power to promulgate administrative rules is expressly conferred upon this Court under the Judicial Reorganization Amendment, and under Section 8 explicit recognition is made of the inherent rulemaking power of the Court, which prior to the Judicial Reorganization Amendment had been utilized by this Court to adopt judicial rules. *In re Mann,* 151 W. Va. 644, 154 S.E.2d 860 (1967); *Boggs v. Settle,* 150 W. Va. 330, 145 S.E.2d 446 (1965); *West Virginia State Bar v. Earley,* 144 W. Va. 504, 109 S.E.2d 420 (1959).

Such rules have the force and effect of statutory law by virtue of Article VIII, Section 8 of the Judicial Reorganization Amendment, where it is stated:

> "When rules herein authorized are prescribed, adopted and promulgated, they shall supersede all laws and parts of laws in conflict therewith, and such laws shall be and become of no further force or effect to the extent of such conflict."

Prior to the adoption of the Judicial Reorganization Amendment, there may have been some question as to this Court's supervisory powers over lower courts. *See, Fahey v. Brennan,* 136 W. Va. 666, 68 S.E.2d 1 (1951). It is now quite clear under the Judicial Reorganization Amendment that considerable supervisory powers have been conferred upon this Court.[4]

---

[4] All references herein are to Article VIII of the *West Virginia Constitution.* Under *Section 3,* the right is given to promulgate rules, civil and criminal, for all courts; also general supervisory control is given over all intermediate appellate courts, circuit courts and magistrate courts. The Chief Justice has the power to assign judges on a temporary basis. *Section 5* provides that the Supreme Court "shall provide for dividing the business of those circuits" in which there is more than one judge. This section also requires the Supreme Court to designate the times at which each circuit court shall sit. In *Section 6,* which relates to the powers of circuit courts, their rulemaking and supervisory powers over the magistrate courts are expressly made subject to the approval and

There was also some confusion prior to the Judicial Reorganization Amendment as to what further action a disqualified judge could take in the case. This arose partly out of the fact that there was no clear authority in the Supreme Court to temporarily assign judges in such situations. Consequently, the disqualified judge had either to initiate the election of a special judge pursuant to W. Va. Code, 51-2-10, or to attempt to transfer the case to another circuit court in accordance with W. Va. Code 56-9-2.

The statute relating to disqualification of judges contained a proviso permitting the judge "... to enter a formal order designed merely to advance the cause towards a final hearing and not requiring judicial action involving the merits of the case." W. Va. Code 51-2-8. This proviso was added in the 1931 revision of the West Virginia Code to conform to the case law existing at that time. *See, Forest Coal Company v. Doolittle*, 54 W. Va. 210, 46 S.E. 238 (1903); *Findley v. Smith, supra.*

Undoubtedly, one of the reasons behind the Judicial Reorganization Amendment was to provide a more simplified system of handling the problem of securing a replacement judge where the original judge is disqualified. The former procedures were cumbersome at best. Special judge elections were constantly attacked and in many instances overturned because of some technical failure to follow W. Va. Code 51-2-10. *See, State ex rel. Lunsford v. Weber*, 153 W. Va. 544, 170 S.E.2d 671 (1969); *Brinkley v. Brinkley*, 147 W. Va. 557, 129 S.E.2d 436 (1963); *State ex rel. Black v. Pennybacker*, 144 W. Va. 612, 110 S.E.2d 265 (1959); *Brown v. Miller*, 103 W. Va. 282, 137 S.E. 227 (1927); *State ex rel. First National Bank v. Amos*, 100 W. Va. 555, 131 S.E. 264 (1926); *State v. Burnett*, 47 W. Va. 731, 35 S.E. 983 (1900).

The alternative method of sending the case to another circuit was of little benefit, at least subsequent to the

control of the Supreme Court. By virtue of *Section 8*, broad powers are placed in the Supreme Court for the censure, temporary suspension, retirement and removal of judges.

1939 amendment, in that the receiving judge could decline to hear the case because of his workload.[5] W. Va. Code, 56-9-2.

The administrative rule promulgated by this Court now controls the procedure for selection of a temporary judge where a disqualification exists as to a circuit court judge. Under Article VIII, Section 8 of the *West Virginia Constitution*, it operates to supersede the existing statutory provisions found in W. Va. Code, 51-2-9 and -10, and W. Va. Code, 56-9-2, insofar as they relate to the selection of special judges or the assignment of the case to another circuit judge when a circuit judge is disqualified.

It is clear that the appropriate procedures were not followed in the selection of the respondent judge. The focal point of error was on July 28, 1976. At that time, Judge Meredith had recused himself from the case as a result of the July 8 hearing. It was not within his power to determine on an ex parte basis that Judge Fox was disqualified.[6]

The error was further compounded by the failure to fully disclose to this Court the reasons surrounding the disqualification and, in particular, the fact that counsel for the involved parties had been informed at the termination of the July 8 hearing that the case was transferred to Judge Fox. This would have alerted this Court on July 28 that another judge was involved in the case.

The administrative rule existing at the time required such matters to be communicated in writing to the Chief

---

[5] *State ex rel. Fahey v. Brennan,* 139 W. Va. 122, 79 S.E.2d 109 (1953), serves to illustrate some of the practical problems that existed in securing a temporary judge.

[6] Admittedly, the administrative rule adopted May 29, 1975, contained some ambiguity as to whether, in a multi-judge circuit upon disqualification of one judge, the case would automatically be assigned by the Chief Justice of this Court to another judge in the same circuit. It is, therefore, perhaps understandable that Judge Meredith and involved counsel thought at termination of the July 6 hearing that the case could be transferred to Judge Fox, without approval of the Chief Justice.

Justice of this Court. While there may arise occasions in connection with a disqualification of a judge that require immediate personal communication with the Chief Justice of this Court, no such emergency existed in the present case. Obviously the purpose of requiring full disclosure to this Court is to enable it to make an intelligent decision on the matter.

Finally, it may be admitted that this Court's personnel compounded the error by failing to follow the administrative rule which vested in the Chief Justice of this Court the ultimate decision as to the selection of a temporary judge. Returning to Judge Meredith with a list of available circuit judges and permitting him to indicate a preference resulted in his participation in the selection of the respondent judge. This was improper in view of his previous voluntary disqualification from the case.[7]

As noted in the early portion of this opinion, this Court has consistently viewed cases involving the selection of special judges with a meticulous concern for the procedural steps under which they were selected. The underlying rationale for this meticulousness rests on the premise that a judicial officer must be shown to have been properly selected. It is part of a larger rule which conceives that the cornerstone of any judicial system rests upon the integrity of its judges.

Justice Frankfurter, in explanation of the public's acceptance of judicial decisions, stated in *Baker v. Carr*, 369 U.S. 186, 267, 7 L. Ed. 2d 663, 82 S. Ct. 691 (1962)

---

[7] We have not considered the underlying merits of the disqualification motion since this is not an issue in the present case. We do point out that by an administrative rule promulgated October 1, 1976, a Judicial Inquiry Commission has been created whose duties emcompass the receipt, initiation and investigation of complaints against Justices, Judges and Magistrates. As a part of this same rule, a Judicial Review Board was created to hear such complaints filed by the Judicial Inquiry Commission. This rule was designed to provide an appropriate disciplinary procedure for judicial officials who violate the Code of Judicial Conduct. Canon 3C of the Code of Judicial Conduct provides standards for disqualification of a judge, and these would be applicable for a disqualification motion.

(dissenting opinion), that, "[T]he court's authority—possessed of neither the purse nor the sword ultimately rests on sustained public confidence in its moral sanction." He expressed a parallel thought in *Offutt v. United States*, 348 U.S. 11, 14, 99 L. Ed. 11, 75 S. Ct. 11 (1954), that "justice must satisfy the appearance of justice."

In *Forest Coal Co. v. Doolittle, supra,* this Court quoted with approval the following passage found in *Oakley v. Aspinwall*, 3 Com. (N.Y.) 547, 552:

> " 'It is the design of the law to maintain the purity and impartiality of the courts, and to insure for their decisions the respect and confidence of the community. Their judgments become precedents which control the determination of subsequent cases; and it is important, in that respect, that their decisions should be free from all bias. After securing wisdom and impartiality in their judgments, *it is of great importance that the courts should be free from reproach or the suspicion of unfairness*. The party may be interested only that his particular suit should be justly determined; *but the state, the community is concerned not only for that, but that the judiciary shall enjoy an elevated rank in the estimation of mankind.'* " [54 W. Va. at 227] [Emphasis in the original]

We conclude that, under the foregoing law, the procedure utilized in the selection of the respondent, Judge McClure, did not measure up to the standards set forth above. As a result, his appointment is void and the writ of prohibition will be granted. This Court will, by separate order of the Chief Justice thereof, assign a new judge to hear the underlying partition suit.

Since the parties do not assert that there was any error committed in the underlying partition suit arising out of the matters surrounding the disqualification of Judge Meredith, the newly assigned judge will accept the case in its present posture.

Those objections made by the parties in the partition suit are, of course, preserved, and since the partition

suit has not reached a final conclusion, the newly assigned judge may, in his discretion, review such prior ruling as he deems appropriate.

The existing administrative rule dealt only with the procedure to be followed in the appointment of a temporary judge where a circuit judge was disqualified. It did not involve the further problem of how a motion for disqualification should be handled. In order to provide guidelines in this latter area, this Court has concluded that it is appropriate to promulgate a new administrative rule which covers not only the selection of a temporary judge, but establishes guidelines for handling motions for disqualification. A copy of this new administrative rule, which supersedes the existing rule, is attached as Appendix A to this Opinion.

It may be helpful to discuss some of the aspects of the new rule. Under it, the appropriate action to follow where a circuit court judge is confronted by a motion for disqualification is to adopt one or two courses. First, he may determine from the face of the motion that he will voluntarily disqualify himself from further participation in the case, in which event he shall contact the Chief Justice of this Court, pursuant to the provisions of the administrative rule, for purposes of obtaining a replacement judge.

As a second option, the judge before whom the motion to disqualify is filed may decide that the motion lacks merit and that he should not voluntarily disqualify himself.[8] In this event, he shall cease further participation

---

[8] It should be clearly understood that in adopting the administrative rule in regard to disqualification, we do not mean to suggest that a judge should automatically disqualify himself upon the filing of a disqualification motion. The rule goes only to the procedural aspects of who shall hear the motion. We are in firm accord with the rule followed particularly in the federal courts, that a judge "has a duty to sit where not disqualified which is equally as strong as the duty to not sit where disqualified." *Laird v. Tatum*, 409 U.S. 824, 837, 34 L. Ed. 2d 50, 93 S. Ct. 7 (1972), and the cases cited therein. We would also point out the parties may by express written agreement waive a particular disqualification of a judge so

in the case and notify the Chief Justice of this Court in accordance with the new administrative rule, for purposes of having a judge assigned to hear the disqualification motion.

It is to be understood that in formulating the administrative rule in Appendix A, it is not possible to anticipate every situation that may arise on a disqualification motion.[9] The rule seeks to accomplish two broad goals: to remove the involved judge from having to hear matters involving his own disqualification, and to place the responsibility of assigning a temporary judge to hear these matters in this Court. This latter goal is designed to avoid the problem of having a colleague judge in a multi-judge circuit bear the burden of passing on the disqualification of a fellow judge with whom he works on a daily basis.

We close as we opened, with the statement that nothing in the record before us nor in this Opinion is to be construed as suggesting that the respondent, Judge McClure, was guilty of any impropriety. He was the victim of procedural error in his selection over which he had no control.

*Writ awarded.*

## Appendix A

### ADMINISTRATIVE RULE

Procedures as to disqualification and temporary assignment of circuit court judges promulgated pursuant

---

long as the disqualification does not involve a matter of public policy. 46 Am. Jur. 2d *Judges* § 224; Annot., 73 A.L.R.2d 1238 at 1272 (1960); *see,* W. Va. Code, 51-2-8.

[9] While no question was raised on this appeal concerning the timeliness of the filing of the motion to disqualify, it is generally recognized that such motion must be made with reasonable promptness after discovery of the disqualification. 46 Am. Jur. 2d *Judges* § 202; Annot., 73 A.L.R.2d 1238, 1262, *et seq.* Matters such as this would be among those determined by the judge assigned to hear the disqualification motion.

to Article VIII, Sections 3 and 8 of the Judicial Reorganization Amendment to the Constitution of West Virginia, shall be as follows:

A. Procedure upon the filing of a motion for disqualification:

    (1) In any proceeding upon the filing of a written motion for disqualification, which shall be verified and shall state the facts and reasons for disqualification, and shall be accompanied by a certificate of counsel of record stating it is made in good faith, the circuit judge before whom the matter is pending shall:

        (a) Proceed no further in the matter; and

        (b) Transmit a copy of the motion and certificate to the Chief Justice of the Supreme Court of Appeals, together with a letter advising whether he will recuse himself from the proceeding or that a hearing on the matters surrounding the disqualification motion will be required. The letter should include such other matters as the involved circuit judge may deem relevant.

B. Procedure for temporary assignment of another circuit judge:

    (1) Upon receipt of a copy of the motion for disqualification, certificate and letter from a circuit judge, the Chief Justice shall by order:

        (a) In the case where the involved circuit judge has stated he has voluntarily recused himself from the proceeding, assign another circuit judge either from within or without the circuit where the involved judge sits to hear the underlying proceeding;

        (b) In the case where the involved circuit judge desires to have the matters surrounding the disqualification motion heard, assign another

circuit judge from outside the circuit, where the involved judge sits, to hear the matters surrounding the disqualification motion; and in such event

    (i) The order may specify that the assigned judge shall have authority to take such action in the underlying proceeding as the ends of justice require pending the outcome of the hearing on disqualification.

(2) Upon the completion of the disqualification hearing the assigned judge shall report his findings in writing to the Chief Justice, who by order:

    (a) If the involved judge is found not to be disqualified, may reinstate him to hear the underlying proceeding, or the Chief Justice may assign another circuit judge to hear the underlying proceeding.

    (b) In the event that the involved circuit judge is found to be disqualified, the Chief Justice shall assign a circuit judge to hear the underlying proceeding.

C. Voluntary disqualification by a circuit judge:

(1) Any circuit judge may voluntarily recuse himself from a proceeding on the basis that he is disqualified from hearing the same, and in such event:

    (a) He shall promptly transmit in writing to the Chief Justice the reasons why he deems himself disqualified and shall take nor further action in the proceeding.

    (b) The Chief Justice shall by order appoint another circuit judge to hear the underlying proceeding.