418 S.E.2d 917

**Mary E. WHITE, Plaintiff Below, Appellee,**

v.

**Everett BERRYMAN and the West Virginia Department of Transportation, Division of Highways, a West Virginia Governmental Entity, Defendants Below, Appellants.**

No. 20088.

Supreme Court of Appeals of West Virginia.

Submitted Jan. 15, 1992.

Decided May 15, 1992.

Robert P. Fitzsimmons, William E. Parsons, II, Fitzsimmons & Parsons, L.C., Joseph J. John, Louis J. John, John & John, Wheeling, for appellee.

John M. Wilson, Daniel C. Cooper, Steptoe & Johnson, Clarksburg, for appellants.

BROTHERTON, Justice:

The appellants, Everett Berryman and the West Virginia Department of Transportation, Division of Highways, appeal from a December 13, 1990, order of the Circuit Court of Brooke County denying their motion to set aside default judgments which were entered against them by that court on June 21 and July 6, 1990.

On September 19, 1989, the appellee, Mary White, was injured when her automobile was struck by a large steam roller driven by Berryman. The roller was being unloaded by a Division of Highways crew when its brakes failed.[1] The appellee suffered a ruptured disc, which eventually required surgery.

Attorneys for the appellee initially submitted a settlement brochure to the State's insurer, CNA Insurance Company, proposing a $95,000 settlement to the appellee for the injuries she suffered in the accident. Included with the settlement brochure was a copy of the complaint which the appellee intended to file in circuit court if a settlement was not reached. There were several subsequent conversations between CNA adjusters and one of the appellee's attorneys, Joseph J. John, requesting additional claim information. However, the insurance company made no settlement offer until May 7, 1990, when CNA adjuster Nancy

---

1. The appellee indicates that in the official accident report, Berryman stated that the collision occurred because of the steam roller's inoperable brakes.

Moses[2] responded with an offer of $3,600. The appellee considered this an inadequate offer, and filed suit in the Circuit Court of Brooke County on May 15, 1990, demanding judgment against Berryman and the West Virginia Department of Transportation, Division of Highways, in an amount in excess of $200,000 as compensatory damages.

Berryman received personal service via a Brooke County deputy sheriff, who served Berryman's wife. She, in turn, delivered the documents to Berryman on the evening of May 15, 1990. Initially, the appellee requested that the West Virginia Department of Transportation, Division of Highways, be served through the Secretary of State. However, by letter dated May 18, 1990, the Brooke County Circuit Clerk's office advised appellee's counsel that the Secretary of State was no longer authorized to accept service on behalf of state agencies.[3] Thereafter, the Sheriff of Kanawha County was directed to serve the complaint, summons, interrogatories, and requests for production of documents on Arthur L. Gleason, Jr., Supersecretary of the Department of Transportation. A deputy sheriff delivered these documents to Kim Miller, Gleason's secretary, on June 4, 1990. Ms. Miller forwarded them to the Administrative Assistant of the Department of Transportation, Phyllis Holmes, who placed them on Supersecretary Gleason's desk.

The documents were examined by Gleason on June 5, 1990. The envelope was marked "Legal Documents," and the summons was marked "ORIGINAL" in large boldface black print. The summons warned that a default judgment would be taken if no answer or other pleading was filed within thirty days.

On June 21, 1990, and July 6, 1990, default judgments for sums uncertain were entered against Berryman and the West Virginia Department of Transportation, Division of Highways, respectively.[4] In an affidavit, Berryman later claimed that, based upon advice he received from his attorney, Ron Tucker, who was representing him in another matter, "he believed that the documents he had received did not require a response on his part since he assumed that he would be defended by an attorney representing the State Department of Transportation." The appellants' counsel categorizes Berryman's inaction as being the result of "misunderstanding, mistake or inadequate advice." We note, however, that the appellants did not introduce either an affidavit or testimony from Ron Tucker to corroborate Berryman as to exactly what advice was offered by Tucker.

To explain its failure to respond to the summons and complaint, the Department of Transportation states that when Supersecretary Gleason first noticed the legal documents on his desk on June 5, 1990, he believed they were simply copies of a summons and complaint which had been directed to his office for informational purposes, because he did not normally receive the original pleadings when the Department of Transportation was served with process. The appellants state that on the two previous occasions when the newly formed De-

---

2. Nancy Moses was the claims representative who was assigned to handle Mary White's claim against the Department of Transportation from November 20, 1989, until June 20, 1990.

3. Rule 4 of the West Virginia Rules of Civil Procedure does not specifically address the service of process upon a State agency. West Virginia Code §§ 56–3–13, 14, and 15 explain only how service of process may be made upon domestic and foreign corporations and other common carriers.

Rule 4(d)(6) of the Federal Rules of Civil Procedure provides that service shall be made:

[u]pon a state or municipal corporation or other governmental organization thereof subject to suit, by delivering a copy of the summons and of the complaint to the chief executive officer thereof or by serving the summons and complaint *in the manner prescribed by the law of that state for the service of summons or other like process upon any such defendant.* (Emphasis added.)

4. Both default judgment orders contained notice that a hearing on a writ of inquiry to determine the amount of damages sustained by the plaintiff was scheduled to be held at 9:00 a.m. on July 25, 1990.

partment of Transportation had been served with process, the originals were directed to the Department's legal division: "Consequently, Secretary Gleason mistakenly assumed that the matter was being handled by the legal department and did nothing to assure the appropriate action would be taken to defend the suit. Secretary Gleason did not notify CNA that a suit had been filed."

Unaware that a suit had been filed and that default judgments had been entered, CNA claims representative, R. Alan Mellott,[5] sent a letter to Mr. John on July 18, 1990, in which he inquired about the outstanding settlement offer. By letter dated July 20, 1990, and received by CNA on July 24, 1990, Mr. John informed Mr. Mellott as follows: "Please be advised that the $3,600 offer of settlement was rejected per the telephone conference with Ms. Moses and *CNA was advised that we would proceed accordingly.*" (Emphasis added.) Mr. John did not mention the entry of the default judgment orders or the hearing on the writ of inquiry to determine damages which was scheduled for July 25, 1990.

However, Mr. Mellott contacted Mr. John once again on August 13, 1990. At this time, Mr. John told him that the appellee would settle the claim for $75,000, and he also told Mellott that default judgments had been entered in the case. According to the appellants, this was the first time a CNA representative was notified about the lawsuit and the default judgments, and they were still unaware of the pending hearing on the writ of inquiry, which had been rescheduled and was now set for August 23, 1990.

On August 16, 1990, Mr. Mellott contacted Wheeling attorney Paul T. Tucker and asked him to investigate the matter further. Mr. Tucker claims that he was able to confirm through the circuit clerk's office only that default judgment orders had been

entered and that a hearing on the writ of inquiry would be scheduled. However, the appellee states that the Brooke County Courthouse file contained not only the default judgment order, but also an order scheduling the hearing on the writ of inquiry, which had originally been set for July 25, 1990, but was continued to August 23, 1990.[6]

On August 17, 1990, Mr. Tucker contacted Mr. Mellott and advised him of the default judgment orders and "that a hearing on Writ of Inquiry would be scheduled in the matter." Mr. Mellott subsequently delivered the claim file to Tucker so that he could represent the appellants. However, according to the appellee, "no notice of appearance or any other type of notice indicating an attorney's representation was ever filed and/or served and/or mentioned until the appellants filed a motion to set aside the default judgments almost two months later, on October 8, 1990.

The writ of inquiry was tried to a jury on August 23, 1990. No one representing the appellants was present, and the jury returned a $500,000 verdict for the plaintiff. In an affidavit, Mr. Mellott stated that he did not become aware of the $500,000 verdict until nearly a month later, on September 21, 1990. On September 25, 1990, the appellants retained new counsel, and a motion to set aside the default judgment was filed on October 8, 1990.

After a full hearing, the court below denied the appellants' motion to set aside the default judgments in a memorandum of opinion dated November 15, 1990, and in a subsequent order dated December 13, 1990. The court concluded that under the circumstances presented by the appellants in their affidavit, this case did not fall within the provisions of Rule 60(b) of the West Virginia Rules of Civil Procedure, which allows a court the discretion to set aside a default judgment.

---

5. Mr. Mellott was assigned to handle Mary White's claim on July 13, 1990.

6. The appellants argue that because the order scheduling the hearing for August 23, 1990, is also dated August 23, 1990, it is not clear from the record whether the hearing was on the court's schedule or if the order was actually in the file when Mr. Tucker made his inquiry in the clerk's office.

The critical question in this case is whether service made on a secretarial employee is sufficient to constitute adequate service upon a state agency which is the named defendant.[7] Encompassed within this question is the further inquiry of how service of process should be made on a state agency. We address this latter question first.

■ Rule 4(d)(6) of the West Virginia Rules of Civil Procedure specifies how service can be made upon domestic public corporations. It provides:

(6) Domestic Public Corporations.—

(A) Upon a city, town, or village, by delivering a copy of the summons and of the complaint to its mayor, city manager, recorder, clerk, treasurer, or any member of its council or board of commissioners;

(B) Upon a county court of any county or other tribunal created to transact county business, by delivering a copy of the summons and of the complaint to any commissioner or the clerk thereof or, if they be absent, to the prosecuting attorney of the county;

(C) Upon a board of education, by delivering a copy of the summons and of the complaint to the president or any member thereof or, if they be absent, to the prosecuting attorney of the county;

(D) Upon any other domestic public corporation, (A) by delivering a copy of the summons and of the complaint to any officer, director, or governor thereof, or (B) by delivering copies thereof to an agent or attorney in fact authorized by appointment or by statute to receive or accept service in its behalf.

The historical development of this rule is mentioned in M. Lugar & L. Silverstein, *West Virginia Rules* 47 (1960):

Rule 4(d)(6) of the West Virginia Rules corresponds generally to paragraphs (5) and (6) in the Federal Rule, but the West Virginia provision is much more detailed. This Rule is intended not to alter the former practice as set forth in Code 56-3-13 *except for the addition of clause (D).* In clause (B) the phrase 'or other tribunal created to transact county business' is added to the Code to conform with the State Constitution, art. VIII, sec. 24. (Emphasis added).

Prior to the adoption of the Rules of Civil Procedure, W.Va.Code § 56-3-13 (1931) outlined the various procedures for serving a city, county, or board of education and also included the procedure for serving a domestic corporation.[8] There was no specific statutory provision with regard to service of process on a state agency. This was probably due to the fact that under the

---

**7.** In paragraph 10 of the defendant's motion to set aside the default judgment, this claim is asserted:

[The] attempt to serve process upon the W.Va. Department of Transportation by delivering a copy of a summons and complaint to the receptionist in the Department of Transportation's Office was insufficient in that it failed to put the state agency and its insurance carrier, CNA Insurance Companies (hereinafter "CNA"), on notice that they had been made a party to a civil action[.]

**8.** West Virginia Code § 56-3-13 provided:

Unless otherwise specially provided, process against, or notice to, a corporation created by virtue of the laws of this State may be served as follows:

(a) If a city, town or village, or its mayor, city manager, recorder, clerk, treasurer, or any member of its council or board of commissioners;

(b) If a county court of any county, on any commissioner or the clerk thereof, or if they

be absent, on the prosecuting attorney of the county;

(c) If a board of education of any district or independent school district, on the president or any commissioner thereof, or if they be absent, on the prosecuting attorney of the county;

(d) If any other corporation, on the auditor as statutory attorney in fact of such corporation, as provided in section seventy-one, article one, chapter thirty-one [§ 31-1-71] of this Code, or on any person appointed by it to accept service of process in its behalf, or on its president or other chief officer, or its vice president, cashier, assistant cashier, treasurer, assistant treasurer, secretary, or any member of its board of directors, or, if no such officer or director be found, on any agent of such corporation, including in the case of a railroad company a depot or station agent in the actual employment of the company.

State's constitutional immunity in Article VI, Section 35 of our Constitution,[9] it made little sense to provide for service of process on a state agency. However, with the adoption of W.Va.Code § 29–12–5 in 1957, which foreclosed an insurance carrier that insured a state agency from asserting the sovereign immunity defense, a limited right to sue the State came into being.[10] *See generally Pittsburgh Elevator Co. v. The West Virginia Bd. of Regents,* 172 W.Va. 743, 310 S.E.2d 675 (1983).

When the Rules of Civil Procedure were adopted in 1960, the service of process provisions in subparagraph 4 of W.Va.Code § 56–3–13(d) relating to service of process on domestic corporations were placed in Rule 4(d)(5).[11] As discussed by M. Lugar & L. Silverstein, *supra* at 47, with the advent of Rule 4(d)(6)(D), relating to service "[u]pon any other *domestic* public corporation," a new service of process method was established. This rule provides a means of service upon a domestic public corporation

other than those mentioned in Rule 4(d)(6)(A) through (C). This conclusion is buttressed by the fact that all of the entities mentioned in Rule 4(d)(6) are public corporations.[12]

■ It cannot be doubted that the Division of Highways is a public corporation as stated in W.Va.Code § 17–2–1: "The state road commission of West Virginia, heretofore created and existing as a corporation, shall be and is hereby continued...."[13] The term "public corporation" has a well-recognized legal significance and is generally held to be one created by the State for political purposes and to act as an agency in the administration of government. We gave this explanation in *State ex rel. Sams v. Ohio Valley General Hospital Association,* 149 W.Va. 229, 140 S.E.2d 457, 460 (1965), in which we quoted this language from *Levin v. Sinai Hospital of Baltimore City,* 186 Md. 174, 46 A.2d 298 (1946): " 'A public corporation is an instrumentality of the State, founded

---

9. Article VI, Section 35 of the West Virginia Constitution provides:

   The State of West Virginia shall never be made defendant in any court of law or equity, except the State of West Virginia, including any subdivision thereof, or any municipality therein, or any officer, agent, or employee thereof, may be made defendant in any garnishment or attachment proceeding, as garnishee or suggestee.

10. Under W.Va.Code § 29–12–5, the state board of insurance provides insurance for state agencies and the statute directs:

    Any policy of insurance purchased or contracted for by the board shall provide that the insurer shall be barred and estopped from relying upon the constitutional immunity of the state of West Virginia against claims or suits: Provided, That nothing herein shall bar the insurer of political subdivisions from relying upon any statutory immunity granted such political subdivisions against claims or suits.

11. Rule 4(d)(5) of the Rules of Civil Procedure provides:

    Domestic Private Corporations.—Upon a domestic private corporation, (A) by delivering a copy of the summons and of the complaint to an officer, director or trustee thereof; or, if no such officer, director or trustee

be found, by delivering copies thereof to any agent of the corporation including, in the case of a railroad company, a depot or station agent in the actual employment of the company; but excluding, in the case of an insurance company, a local or soliciting agent; or (B) by delivering copies thereof to any agent or attorney in fact authorized by appointment or by statute to receive or accept service in its behalf.

12. The right to alter procedural rules is expressly granted to this Court in Article VIII, Section 3 of the West Virginia Constitution, which provides: "The court shall have power to promulgate rules for all cases and proceedings, civil and criminal, for all of the courts of the State relating to writs, warrants, process practice and procedure, which shall have the force and effect of law." As we stated in *Stern Bros., Inc. v. McClure,* 160 W.Va. 567, 236 S.E.2d 222, 226 (1977), this constitutional holding was "explicit recognition ... of the inherent rulemaking power of the Court ... [that] had been utilized by this Court to adopt judicial rules." (Citations omitted).

13. West Virginia Code § 17–2A–1 provides, in relevant part, that "[t]he office of state road commissioner heretofore existing is hereby continued in all respects as heretofore constituted, but is hereby designated as the West Virginia department of highways."

and owned by the State in the public interest, supported by public funds, and governed by managers deriving their authority from the State.'" *See also Meisel v. Tri-State Airport Authority*, 135 W.Va. 528, 64 S.E.2d 32 (1951).

Thus, we conclude that the service of process provisions of Rule 4(d)(6)(D), can be used on domestic public corporations, which include state agencies, that are not otherwise covered in Rule 4(d)(6)(A) through (C).

■ It is to be noted that Rule 4(d)(6)(D) provides two methods of service of process. It can be served upon "any officer, director, or governor thereof" or upon "an agent or attorney in fact authorized by appointment or by statute to receive or accept service in its behalf." We believe that under this language and the provisions of W.Va.Code § 31–1–15, service on a domestic public corporation can be accomplished by serving the Secretary of State. The language of W.Va.Code § 31–1–15 states that "[t]he secretary of state is hereby constituted the attorney-in-fact for and on behalf of every corporation created by virtue of the laws of this State[.]" [14] The phrase "every corporation created by virtue of the laws of this State" in W.Va.Code § 31–1–15 is sufficiently comprehensive to include a public corporation or agency authorized by the legislature. [15] We, therefore, conclude that under W.Va.Code § 31–1–15, the Secretary of State is the authorized attorney-in-fact to accept service of process on public corporations and agencies pursuant to the provisions of Rule 4(d)(6)(D) of the Rules of Civil Procedure.

■ Having established the procedure for service of process on a public corporation, we address the service in this case. Here the service was attempted by serving Mr. Gleason, who was the Secretary of the Department of Transportation, which includes the Division of Highways. There is no dispute that this was a proper official for service under Rule 4(d)(6)(D). However, service was not made upon Mr. Gleason. Rather, the deputy sheriff served the papers upon Mr. Gleason's secretary, who forwarded them to Ms. Holmes, his administrative assistant, who placed them on Mr. Gleason's desk. Mr. Gleason's affidavit indicates that he was unaware of their legal purport and thought that copies had been given to the legal division.

We have found cases where the courts have considered whether in a suit against a public corporation or official, service of process upon a secretary is adequate. These courts conclude that service on a secretarial employee is insufficient to constitute valid service absent a showing that such person was authorized to accept service. *See, e.g., Franz v. Board of Educ. of Elwood Union Free Dist.*, 112 A.D.2d 934, 492 N.Y.S.2d 452 (1985); *Brakkee v. Rudnick*, 409 N.W.2d 326 (N.D.1987); *Nitardy v. Snohomish County*, 105 Wash.2d 133,

---

**14.** The relevant portion of W.Va.Code § 31–1–15 is:

> The secretary of state is hereby constituted the attorney-in-fact for and on behalf of every corporation created by virtue of the laws of this State and every foreign corporation authorized to conduct affairs or do or transact business herein pursuant to the provisions of this article, with authority to accept service of notice and process on behalf of every such corporation and upon whom service of notice and process may be made in this State for and upon every such corporation. No act of such corporation appointing the secretary of state such attorney-in-fact shall be necessary.

**15.** We are aware of a November 13, 1985, letter from the Office of the Attorney General advising the Secretary of State that there was no need to accept service of process on governmental agencies as an attorney-in-fact. We find the letter's analysis to be flawed. It does not trace the development of the domestic public corporation service of process provisions in Rule 4(d)(6). It relies on Article XI, Section 1 of the West Virginia Constitution, which authorizes the legislature to provide by general law for the creation of private corporations. It then concludes that it is only these corporations for which the Secretary of State is attorney-in-fact. Article XI, Section 1 has no application to the legislative power to create public corporations and agencies. The letter does not address the public corporations created by the legislature which are entities created by the legislature and thus existing by virtue of the laws of this State.

712 P.2d 296 (1986); *Meadowdale Neighborhood Committee v. City of Edmonds*, 27 Wash.App. 261, 616 P.2d 1257 (1980).[16] A similar rule exists in the federal system under its service of process statute as to serving state public corporations. *See, e.g., Richards v. New York State Dept. of Correctional Services.*, 572 F.Supp. 1168 (S.D.N.Y.1983); *Miree v. United States*, 490 F.Supp. 768 (N.D.Ga.1980).

■ Thus, we conclude that service of process on a secretary in a public corporation or agency is insufficient to constitute service on the public corporation or agency absent a clear showing that such individual was delegated by the corporation or agency to accept process.

■ This conclusion would render the default judgment against the West Virginia Department of Transportation invalid. However, this same conclusion cannot be reached with regard to Berryman, who was served at his home by delivering a copy of the summons and complaint to his wife on May 15, 1990. There is no question that under Rule 4(d)(1)(A), service of process upon an individual who is not incompetent or under a disability can be made "by delivering a copy of the summons and complaint to him personally, or by delivering ... [the same] at his dwelling house or usual place of abode to a member of his family above the age of sixteen (16) years[.]"

■ Berryman's affidavit states that upon his return from work on May 15, 1990, his wife showed him the suit papers. His affidavit states that "upon examining the documents, he determined that they were legal documents naming him in con-

nection with a lawsuit brought by Mary E. White[.]" Berryman then goes on to state that he sought the advice of a Fairmont attorney who told him that a response was not necessary since he would be defended by an attorney representing the Department of Transportation. No affidavit was submitted from the attorney.

This was the only statement made to show excusable neglect on the part of Berryman. Not only does it lack factual details, but it leaves the obvious question as to why he would not have mentioned the suit to his superiors in the local highway office. His affidavit clearly indicates that he was aware of the legal consequences of the suit.

The remainder of this opinion concerning the single appellant, Berryman, would also apply as to the Division of Highways had we determined that there was proper service.

■ Rule 60(b) states, in part, that "[o]n motion and upon such terms as are just, the court may relieve a party or his legal representative from a final judgment, order, or proceeding for the following reasons: (1) Mistake, inadvertence, surprise, excusable neglect, or unavoidable cause; ...." "When a court undertakes to analyze a Rule 60(b) motion on grounds (1), (2), (3), or (6) of the Rule, it must determine first if the motion has been filed within eight months after the judgment was entered and then determine, under all the circumstances, if it was filed within a reasonable time." Syl. pt. 2, *Savas v. Savas*, 181 W.Va. 316, 382 S.E.2d 510 (1989). There is no question that Berryman filed

---

**16.** With regard to private corporations and their officers, there is a split of authority as to the validity of service of process upon the secretary or assistant of such individual. Some jurisdictions hold that such service is insufficient to confer personal jurisdiction in the absence of evidence that the secretary or assistant was authorized to accept service. *See, e.g., Hauser v. Schiff*, 341 So.2d 531 (Fla.App.1977); *Adams v. Gluckman*, 183 Ga.App. 666, 359 S.E.2d 710 (1987); *Bray v. Bayles*, 228 Kan. 481, 618 P.2d 807 (1980); *French v. Gabriel*, 57 Wash.App.

217, 788 P.2d 569 (1990). Other jurisdictions hold that such service is sufficient where the secretary or assistant is otherwise competent to accept service and does so. *See, e.g., Martin v. District Court*, 150 Colo. 577, 375 P.2d 105 (1962); *Merrill Chadwick Co. v. October Oil Co.*, 725 P.2d 17 (Colo.App.1986); *A–Z Equip. Co. v. Moody*, 88 Ill.App.3d 187, 43 Ill.Dec. 438, 410 N.E.2d 438 (1980); *Psathas v. Catskill Regional Off–Track Betting Corp.*, 173 A.D.2d 1070, 570 N.Y.S.2d 407 (1991).

his 60(b) motion within eight months of the entry of the default judgment orders. However, given the circumstances present in this case, we do not find that his motion was filed within a reasonable time.

In *Parsons v. Consolidated Gas Supply Co.*, 163 W.Va. 464, 256 S.E.2d 758, 762 (1979), this Court "established as a basic policy that cases should be decided on their merits, and consequently default judgments are not favored and a liberal construction should be accorded a Rule 60(b) motion to vacate a default order." However, we also recognized that "[u]nder both the West Virginia and Federal Rules of Civil Procedure, there is the necessity to show some excusable or unavoidable cause to explain the delay in answering. Obviously, the stronger the excusable neglect or good cause shown, the more appropriate it is to give relief against the default judgment." *Id.* The factors that should be considered in an excusable neglect inquiry were expanded by this Court in *Parsons*. In syllabus point 3, we stated that:

> In determining whether a default judgment should be entered in the face of a Rule 6(b) motion or vacated upon a Rule 60(b) motion, the trial court should consider: (1) The degree of prejudice suffered by the plaintiff from the delay in answering; (2) the presence of material issues of fact and meritorious defenses; (3) the significance of the interests at stake; and (4) the degree of intransigence on the part of the defaulting party.

The appellant argues that the lower court erred when it did not find that their failure to respond to the suit filed against Berryman resulted from mistake, inadvertence, or excusable neglect, as recognized by Rule 60(b). We disagree. In syllabus point 3 of *Hinerman v. Levin*, 172 W.Va. 777, 310 S.E.2d 843 (1983), we stated that "[a]ppellate review of the propriety of

a default judgment focuses on the issue of whether the trial court abused its discretion in entering the default judgment." " 'A motion to vacate a default judgment is addressed to the sound discretion of the court and the court's ruling on such motion will not be disturbed on appeal unless there is a showing of an abuse of such discretion.' Syl. pt. 3, *Intercity Realty Co. v. Gibson*, 154 W.Va. 369, 175 S.E.2d 452 (1970)." *Id.* at syl. pt. 4. We find no abuse of discretion by the trial court in entering default judgment against Berryman.

Berryman's sole justification is that an attorney informed him to disregard the suit papers. It is generally held that an attorney's negligence will not serve as the basis for setting aside a default judgment on grounds of "excusable neglect." In *Badalow v. Evenson*, 62 Mich.App. 750, 233 N.W.2d 708, 710 (1975), the Michigan Court of Appeals stated that it is "virtually axiomatic" that the "neglect or omission of a defendant's attorney does not constitute adequate grounds for setting aside a default judgment." In *DeClerk v. Tribble*, 276 Ark. 316, 637 S.W.2d 526 (1982), an attorney stated that he had prepared a timely answer, but that due to his secretary's negligence, it was not brought to his attention again until four days after it was due. The Arkansas Supreme Court refused to characterize this inaction as "excusable neglect:" "If such carelessness is excusable, then any attorney can shift the responsibility for filing any pleading to his secretary by simply dictating the pleading and dismissing the matter from his mind." *Id.*, 637 S.W.2d at 527.[17] *See* Annot., 64 A.L.R. 4th 323, 340 (1988).

Another factor mitigating against relief is the attorney's subsequent failure to do *anything at all* upon becoming aware of the default judgments. This cannot be overlooked, and it certainly will not be condoned. It is inconceivable to this Court that the appellant's attorney would act in

---

**17.** *See generally,* Comment, *Service of Process— Default Judgment: A Practical Guide for the Arkansas Attorney,* 40 Ark.L.Rev. 381 (1986); Note, *Default Judgments in Arkansas: Allstate Insurance Co. v. Bourland,* 43 Ark.L.Rev. 92 (1990).

so cavalier a manner as to fail to inquire further upon learning that default judgment had been entered against Berryman and that a hearing on a writ of inquiry would soon be scheduled. The appellee certainly was not obligated to keep the appellant abreast of all developments in this case, but Mr. John did tell Mr. Mellott about the default judgments on August 13, 1990, in advance of the hearing on the writ of inquiry. Mr. Paul Tucker was aware on August 17, 1990, that a writ of inquiry was still pending, but he apparently never ascertained the date of the hearing, which was held on August 23, 1990, nor did he put the appellee on notice that he was representing the parties by filing notice of appearance with the court and having it made part of the record.

Certainly, when Berryman first learned that default judgment had been entered against him, he should have moved immediately to have the order set aside, or at least filed a notice of appearance. This would have been a rational, reasonable response, indicating that the appellant had some degree of interest in the proceedings which were going forward without him. It would have at the very least enabled him to defend against the writ of inquiry. Instead, however, counsel for the appellant was unresponsive.

In spite of the fact that he knew that a hearing on the writ of inquiry was pending at least a week before it was actually held, the appellant maintains that he did not become aware of the $500,000 verdict against him for over a month.[18] Thus, a motion to set aside the default judgment was the first action the appellant took in this case, and it was not filed until October 8, 1990, nearly two months after the appellant first became aware that the default judgment order had been entered against him, and over three months after the order was actually entered.

In *Hinerman, supra,* this Court stated that although we are "quite willing to review default judgments and to overturn them in cases where good cause is shown, a demonstration of such good cause is a necessary predicate to our overruling a lower court's exercise of discretion." *Hinerman,* 172 W.Va. at 782, 310 S.E.2d at 848. In this case, the appellants have made no demonstration of "good cause" that would warrant overruling the lower court's exercise of its discretion in refusing to set aside the default judgments.

■ We find that the default judgment against Berryman is valid. However, he was an employee of the West Virginia Department of Transportation, Division of Highways, and the Department's insurance carrier had undertaken representation of him, as evidenced by the settlement negotiations and the employment of attorneys to file Rule 60(b) motions for both appellants. The gravamen of this case is the size of the verdict. In light of the amount of the settlement offers and the provable special damages, this sizeable verdict obviously resulted from the failure of the appellants' attorneys to immediately make an appearance on the record, which would have entitled them to notice of the writ of inquiry. At the very least, they could have contested the appellee's evidence. Therefore, we conclude that the Division of Highways' insurance carrier is responsible for the judgment against Berryman.

For the foregoing reasons, the December 13, 1990, order of the Circuit Court of Brooke County is affirmed in part and reversed in part, and this case is remanded for entry of an order consistent with this opinion.

Affirmed in part, reversed in part, and remanded.

NEELY, Justice, dissenting:

It is always good sport to stick it to an insurance company, but these days it is getting harder and harder to distinguish

---

18. Actually, the appellants state that the CNA claims representative, Mr. Mellott, did not become aware of the $500,000 verdict until September 21, 1990. They do not indicate when their attorney, Paul Tucker, learned about the hearing or the resulting verdict.

the stickor from the stickee. This case would have settled for less than $100,000,[1] but now the plaintiff (and her lawyers) will receive a windfall of over $400,000 because of what is best described as corporate screw-up. The defendant in this case is the State of West Virginia, which is insured by CNA, a large insurer based in Chicago.

The way that stickors and stickees merge seamlessly of late is that insurance companies base their premiums on loss experience. Today's $400,000 gift to the plaintiff is a loss with no more and no less statistical effect on CNA's premium calculations than any other loss. Who, then, is the real stickee? The $400,000 penalty for failing to answer a complaint bears no relationship whatsoever to the seriousness of the offense, serves no public purpose that cannot better be served by more temperate means, and exalts form over substance.

Rule 55, *W.Va.R.Civ.P.* governing default judgments stems from the federal rules originally drafted in 1936 when telephoning next door was more difficult than telephoning Europe is today, when speedy travel was the National Limited from Grafton to Washington, and when the computer was not even a gleam in Alan Turing's eye. Thus, the law of default judgments, with its antique, result-oriented,[2] nebulous and unpredictable concept of "excusable neglect" needs to be revisited in the age of computers, multi-national corporations, employees hired and retained not for efficiency but to satisfy some government requirement or another, and general lack of clarity in lines of responsibility and lines of communication.[3] In other words, there needs to be a more reasonable rule to sanction corporate screw-up (as well, probably, as other screw-up.)

Even in cases where the procedures for service of process are clear, courts around the country have never developed predictable standards for "excusable neglect." In one case in which the failure to file an answer was unintentional, the defendant had a meritorious defense, and no harm was caused to the opposing party, a court applied the test of whether there was some excuse, not even necessarily a good excuse, for the failure to file. *See Dorsey v. Aguirre,* 552 S.W.2d 576 (Tex.Civ.App. 1977). However another court held that neglect equal to mere carelessness would not suffice as excusable neglect. *See International Corporate Enterprises, Inc. v. Toshoku Ltd.,* 71 F.R.D. 215 (N.D.Tex. 1976). Still other courts have applied the classic negligence standard of what a reasonable person would do. *See e.g., Kohlbeck v. Handley,* 3 Ariz.App. 469, 415 P.2d 483 (1966). Certainly the West Virginia Supreme Court of Appeals has been no model of clarity. In most cases we have simply relied on the trial court's discretion while mouthing some broad and vague principles. *See supra* note 2. At the least, one must conclude that our decisions have

---

**1.** At one point, Ms. White offered to settle the case for $95,000.

**2.** Can anyone really imagine that if a union coal miner had a default judgment rendered against him for even $50,000, this court would not twist itself into something resembling a pretzel to find some form or other of "excusable neglect?" To realize the extent of the latitude this Court has given itself in deciding default cases, one need consider only two frequently cited syllabus points on the issue. (Both of which we manage to cite in our recent case of *County Commission of Wood County v. Hanson,* 187 W.Va. 161, 415 S.E.2d 607 (1992).) In syllabus point 2 of *Hamilton Watch Co. v. Atlas Container Co. Inc.,* 156 W.Va. 52, 190 S.E.2d 779 (1972), we held:

> In as much as courts favor the adjudication of cases on their merits, Rule 60(b) of the *W.Va.R. of Civ.P.* should be given a liberal construction.

We have also said in syllabus point 3 of *Intercity Realty Co. v. Gibson,* 154 W.Va. 369, 175 S.E.2d 452 (1970), that:

> A motion to vacate a default judgment is addressed to the sound discretion of the court and the court's ruling on such motion will not be disturbed on appeal unless there is a showing of an abuse of such discretion.

Talk about a hole big enough to drive a truck through!

**3.** In this State, we do not even have a clear-cut procedure for serving process on the State of West Virginia similar to the detailed procedures set forth in Rule 4(d)(4), *Fed.R.Civ.P.,* for serving the United States.

been extremely fact oriented. *See e.g., Hinerman v. Levin,* 172 W.Va. 777, 310 S.E.2d 843 (1983); *Parsons v. Consolidated Gas Supply Corp.,* 163 W.Va. 464, 256 S.E.2d 758 (1979).[4]

Failure to answer a complaint is a serious matter. In this society, filing a lawsuit is a way of signaling an amorphous, impersonal entity run through computers operated by minimum wage clerical employees that it is time to produce an intelligent human being with settlement authority.[5] However, if the same gum-snapping, indifferent, low-level employees who don't return phone calls, don't answer letters, and haven't a clue how to proceed even when cornered in their offices are allowed to ignore civil process, then the whole court enterprise falls apart.

Nonetheless, for a corporation the size of CNA there must be a meaningful sanction somewhere between a $500,000 default judgment and blanket exoneration through a finding of "excusable neglect." In the case before us there was general incompetence, but no one *deliberately* ignored the summons. Law, it should be remembered, is not properly a game of forfeits!

Allowing large default judgments simply creates excess premium costs entirely un-related to compensating injured victims or furthering other legitimate social purposes. Although I would retain the default judgement sanction for those who *deliberately* ignore process, in circumstances like the one before us today, where there simply has been a failure of communication among bureaucracies, I would create a new sanction lying somewhere between total default and total exoneration.[6]

Therefore, I would hold today that once a defaulting defendant has demonstrated that there was no *intention* to ignore process, the defendant should be allowed to pay the plaintiff whatever the trial court determines to be adequate damages for the plaintiff's (and his lawyer's) annoyance, aggravation, inconvenience, and expenses, or the flat sum of $5,000, whichever is the greater. This is a sufficient sanction to discourage even CNA from the cavalier disregard of civil process, while at the same time not penalizing insurance companies and other corporate defendants out of all proportion to the gravity of their offenses. Furthermore, for the average plaintiff, $5,000 paid immediately is likely to have a sweetening effect on the fiscal day.

I take the time to write this dissent because this default problem occurs regular-

---

4. A standard such as "excusable neglect," which has no generally accepted perimeters, invites the trial court's discretion to be informed by such objective criteria as: (1) Is one of the litigants politically correct, i.e., a minority member, abused woman, environmentalist, etc.? (2) Did one or more of the lawyers contribute generously to the judge's last campaign? (3) Is the defendant an out-of-state corporation with no voting employees in West Virginia? (4) Did the defendant's lawyer room with the judge in law school? and finally, (5) Did the judge ever date the plaintiff's or his lawyer's sister?

5. I once sued Exxon because I was trying to clear title to a cheap piece of land and Exxon had a $500 justice of the peace court judgment lien against the property. I made no less than five long distance telephone calls to New York, Houston, and Pittsburgh trying to discover to whom I could send a certified check for $500 so I could get a release, only to discover that although Exxon is well enough organized to sue every defaulting credit card customer in squire's court, it has absolutely no mechanism to collect judgments and release liens!

My simple complaint in court alleged that (1) Exxon had a lien; (2) we were willing to pay the lien; and (3) Exxon would be required to answer our suit by an attorney who could then accept our money and sign a release. Ironically, however, Exxon did not answer the suit; instead its general counsel sent a letter stating that if I would send $250 to him, I could take a default judgment and clear the title. I did exactly that, but without the availability of court process I would still be waiting for Exxon to figure out who was on first.

6. Nonetheless, when asking a court to set aside a default judgment, the defaulting party must come before the court as a supplicant. Either blustering argument or reluctance to pay default damages to the plaintiff on the spot would, in my opinion, be good and sufficient grounds for the trial court to harden his heart against the defendant and enforce the default.

ly. In the next case, defendant's counsel should offer damages for aggravation, inconvenience, attorneys' fees and expenses or $5,000 to the plaintiff and see what happens. However, even I will have no sympathy for a defaulting defendant who wools the plaintiff around arguing "excusable neglect" and then, only after losing that round, decides to offer the $5,000 (as hereafter adjusted for inflation). To get my vote, the defaulter must offer the $5,000 by tendering a check to the clerk at the same time he files the 60(b) motion. The plaintiff, of course, will undoubtedly prefer the default judgment, but an adventurous trial judge might offer to find excusable neglect upon condition that damages as I describe them be paid, and I would argue for affirmance. And, if the trial judge is reluctant to provide us with a test case, we will, at least, have a record that squarely presents an offer by the defendant to pay the new corporate screw-up surcharge.