459 S.E.2d 374

**Janet M. TENNANT and Larry
B. Tennant, Plaintiffs
Below, Appellees**

v.

**MARION HEALTH CARE FOUNDA-
TION, INC., AKA Marion Health Care
Hospital; Candace Chidester, M.D.; and
Patricia K. Endress, D.O., Defendants
Below, Appellants.**

No. 22642.

Supreme Court of Appeals of
West Virginia.

Submitted May 9, 1995.

Decided June 15, 1995.

William E. Galloway and Daniel P. Taylor, Galloway & Taylor, Weirton, for appellees.

Herbert G. Underwood, Steptoe & Johnson, Clarksburg and Karen Kahle, Steptoe & Johnson, Wheeling, for appellants.

CLECKLEY, Justice:

The appellants and defendants below, the Marion Health Care Foundation, Inc., aka Marion Health Care Hospital; Candace Chidester, M.D.; and Patricia K. Endress, D.O., appeal from an order of the Circuit Court of Marion County granting a new trial. The defendants assert the circuit court should not have granted the plaintiffs below and appellees herein, Janet M. Tennant and Larry B. Tennant, a new trial because there were insufficient grounds to justify setting the verdict aside. The defendants assert the plaintiffs were not prejudiced by the post-verdict revelation of the original trial judge's relationship with opposing counsel and, even if recusal was proper, a jury verdict should not be overturned solely on the appearance of impropriety without evidence proving bias or prejudice on the part of the original trial judge. It is also argued that the reviewing court erred in finding the defendants violated

a prior *in limine* order and in finding error in one of the defendants' jury instructions.

## I.

### FACTS AND BACKGROUND INFORMATION

During March and April of 1989, Janet M. Tennant visited Marion Health Care Hospital (the Hospital) approximately four times for treatment. Lab work performed on March 23, 1989, indicated Mrs. Tennant suffered from severe iron deficiency anemia. Dr. Chidester, a physician and employee of the Hospital, treated Mrs. Tennant's anemia without further investigating the possible underlying cause. Medical records do not reflect any other visits by Mrs. Tennant until August 17, 1989.

On August 17, 1989, Mrs. Tennant returned to the Hospital with rectal complaints and was treated by Dr. Endress. Dr. Endress treated Mrs. Tennant on several occasions at the Hospital through the fall of 1989. Throughout this period, Mrs. Tennant continued to have rectal complaints. On November 17, 1989, Dr. Endress discovered a perirectal abscess. Dr. Endress referred Mrs. Tenant to a surgeon on November 27, 1989, because of the persistence of the abscess.

The surgeon, David McLellan, M.D., further referred Mrs. Tennant to Mohammed Roidad, M.D., a gastroenterologist. Dr. Roidad diagnosed squamous cell carcinoma of the anus on January 9, 1990. Mrs. Tennant was then referred by Dr. Roidad to Ronald Gaskin, M.D., a gastroenterologist at West Virginia University. Dr. Gaskin, in turn, referred Mrs. Tennant to the Cleveland Clinic.

In January, 1990, Mrs. Tennant was examined by Victor Fazio, M.D., and Jeffrey Milsom, M.D., both colorectal surgeons. Because of the advanced stage of the cancer and the size of the lesion, Dr. Fazio and Dr. Milsom agreed surgery was the proper course of treatment for Mrs. Tennant. Mrs. Tennant was not offered a less invasive method of treatment like chemoradiation because the surgeons thought chemoradiation did not offer a good prospect for recovery. An abdominoperineal resection with partial posterior vaginectomy with permanent colostomy was performed on Mrs. Tennant on January 18, 1990, at the Cleveland Clinic. The surgery was successful, with the exception of a nick on her ureter, which required some treatment. Mrs. Tennant has had no recurrence of the cancer nor experienced any long term effects from the nick of her ureter.

Following the surgery at the Cleveland Clinic, Mrs. Tennant continued to seek medical treatment at the Hospital. Dr. Endress continued to provide most of Mrs. Tennant's treatment through June of 1991. Between 1991 and 1992, Mr. and Mrs. Tennant initiated a suit against the Cleveland Clinic for damaging Mrs. Tennant's ureter. The Cleveland Clinic agreed to a settlement that included a waiver of fees and expenses owed to the Clinic.

On August 16, 1991, Mr. and Mrs. Tennant filed an action against the defendants alleging negligent care and treatment by the Hospital and its physicians/employees. The Tennants asserted in their complaint that Mrs. Tennant was deprived of the opportunity to avoid the surgery because of the defendants' negligent failure to diagnose her cancer earlier. Prior to trial, the Tennants filed motions *in limine* requesting the circuit court to restrict the defendants from mentioning anything about the settlement with the Cleveland Clinic. The circuit court entered an order stating "the settlement of the Cleveland Clinic lawsuit will not come in as evidence in this case pending in Marion County, West Virginia[.]" The order also granted the defendants an offset for any sum received by the plaintiffs in the Cleveland Clinic lawsuit against any damages the defendants might pay in this case. Trial commenced on January 26, 1994, before the Honorable Fred Fox II. After five days of trial, the jury returned a verdict in favor of the defendants.

During March, 1993, defense counsel's firm was retained by the liability carrier for the State to defend Judge Fox and others in a civil rights claim by a *pro se* litigant in federal court. One of the defense attorneys in the present case represented Judge Fox. On March 9, 1993, defense counsel made a motion to dismiss the federal case on behalf of Judge Fox. The motion to dismiss was

converted to a motion for summary judgment and was granted on January 31, 1994. It was not until after he received a copy of the federal court order on February 2, 1994, that Judge Fox realized he had any relationship with defense counsel.[1] On February 10, 1994, Judge Fox notified plaintiffs' counsel of his relationship with defense counsel. Judge Fox was permitted by this Court to recuse himself, and the Honorable Rodney B. Merrifield was assigned to hear the post-trial motions.

Following the entry of the judgement order, the plaintiffs filed a motion to set aside the verdict or, in the alternative, a motion for a new trial contending they were prejudiced by Judge Fox's relationship with defense counsel. The motion also alleged the defendants violated the pretrial order prohibiting any mention of the prior settlement with the Cleveland Clinic and that an erroneous jury instruction misstated the appropriate standard of care.

Following a post-trial hearing on April 18, 1994, Judge Merrifield issued an order granting a new trial based on the appearance of impropriety, the violation of the pretrial order, and the erroneous jury instruction. The defendants appeal from this order.

## II.

## DISCUSSION

### A.

### *Standard of Review*

 Before addressing the individual errors raised in the plaintiffs' motion for a new trial, we must resolve the procedural contention of the defendants concerning the appropriate standard of review in this case. As a general proposition, we review a circuit court's rulings on a motion for a new trial under an abuse of discretion standard. *In re State Public Building Asbestos Litigation,* 193 W.Va. 119, 454 S.E.2d 413 (1994) *(Asbestos Litigation ).* Thus, in reviewing challenges to findings and rulings made by a

circuit court, we apply a two-pronged deferential standard of review. We review the rulings of the circuit court concerning a new trial and its conclusion as to the existence of reversible error under an abuse of discretion standard, and we review the circuit court's underlying factual findings under a clearly erroneous standard. Questions of law are subject to a *de novo* review.

The defendants argue that Judge Merrifield's order is not entitled to deference under an abuse of discretion standard because he did not preside at trial, thus he neither had the benefit of hearing the evidence nor assessing the credibility of the witnesses. Our prior cases uniformly suggest that the actions of a judge who did not preside at trial are "not aided or strengthened by any presumption arising from personal knowledge of the character, appearance or demeanor of the witnesses, parties or jurors." *Young v. Duffield,* 152 W.Va. 283, 289, 162 S.E.2d 285, 290 (1968). We have stated in Syllabus Point 1 of *Hendricks v. Monongahela West Penn Public Service Co.,* 115 W.Va. 208, 175 S.E. 441 (1934):

> "Where it appears that the judge who acted favorably upon a motion to set aside a verdict was not the judge who presided at the trial, and that the granting of such motion was tantamount to passing finally upon the respective rights of the parties to the action, the general rule that the action of a trial court in setting aside a verdict and awarding a new trial is entitled to peculiar weight will be relaxed."

 We believe our prior cases do not give adequate consideration and proper respect to Rule 63 of the West Virginia Rules of Civil Procedure, which codifies the principle that, when necessary, a judge different from the one who presided at trial may preside and determine all remaining post-trial motions. Once chosen, a successor judge is given broad discretion in determining whether he or she properly can perform the remaining duties in a trial in which he or she did not preside.[2]

---

1. Judge Fox never met with defense counsel concerning the federal matter nor did he recall the pendency of the federal matter during the Tennants' case.

2. Rule 63 of the West Virginia Rules of Civil Procedure is substantially different from Rule 63 of the Federal Rules of Civil Procedure, which provides that a successor judge "may proceed

The defendants, without mentioning Rule 63, argue that just as an appellate court reviews a trial court's cold record, Judge Merrifield's post-trial rulings were also made on a cold record and, for that reason, should not be given deference under the clearly erroneous standard. Although this is not a case of first impression in West Virginia, its significance is demonstrated by its implication of considerations of judicial independence as well as the effective and expeditious administration of the business of the courts. As a preliminary matter, we note the defendants did not challenge the assignment of Judge Merrifield to succeed Judge Fox, and that, in accordance with Rule XVII of the West Virginia Trial Court Rules for Trial Courts of Record, the transfer of the case to Judge Merrifield was duly authorized and proper in all respects. Considering these facts, we believe this case was particularly proper for disposition by a successor judge. Contrary to the defendants' characterization, this case was not complex and, more significantly, it was a jury trial with a jury verdict. Judge Merrifield, prior to ruling, reviewed the files and records in the case, including a transcript of the proceedings, and heard the same counsel who conducted the trial.

■ Of course, the stage of the proceedings at which the successor judge enters the case is usually the dispositive consideration in determining the successor judge's powers under Rule 63. If the successor judge takes over after a verdict has been entered of record and the remaining task is but to hear post-trial motions, as in this case

"the new judge may perform any action which the first judge could have taken had he not become disabled.... [I]f the transcript of the proceedings is sufficient, he may also rule upon any post-trial motions made by the parties, including a motion for judgment n.o.v. or a motion for a new trial." James Wm. Moore, *Moore's Federal Practice* ¶ 63 at 63–10 (1995).

*See also Lever v. United States,* 443 F.2d 350 (2nd Cir.1971); *Rose Hall, Ltd. v. Chase Manhattan Overseas Banking Corp.,* 576 F.Supp. 107 (D.C.Del.1983), *aff'd* 740 F.2d 956, 740 F.2d 957, 740 F.2d 958 (1984), *cert. denied,* 469 U.S. 1159, 105 S.Ct. 909, 83 L.Ed.2d 923 (1985).[3]

■ We now turn to the question of whether Judge Merrifield's decision should be reviewed under a deferential standard of review. We find that the manner in which Judge Merrifield prepared for this task was efficient, thorough, and exemplary. In these circumstances, once a successor judge is properly assigned pursuant to Rule 63 of the West Virginia Rules of Civil Procedure and Rule XVII of the West Virginia Trial Court Rules for Trial Courts of Record, his or her decision or judgment is to be reviewed on appeal under the same standard that would have been applied to the decision of the original trial judge. To do otherwise would disrupt the administration of justice. To the extent that our prior cases are inconsistent with this decision, they are expressly overruled.[4]

with ... [a trial] upon certifying familiarity with the record and determining that the proceedings in the case may be completed without prejudice to the parties." Otherwise, a new trial should be ordered. The federal rule also authorizes the successor judge to recall any witness. Professor Dale P. Olson in his treatise suggests that in West Virginia the successor judge may also order a new trial if he or she feels that the case cannot be completed without prejudice to the parties. Dale P. Olson, *Modern Civil Practice in West Virginia* § 8.21 at 478 (1984).

3. In deciding post-trial motions, we recognize one exception to the rule that a successor judge steps completely into his or her predecessor's shoes. When the issue is purely one of fact that was previously determined by the jury, the successor judge's powers to alter or limit the verdict is limited. Therefore, when a successor judge

alters or amends a factual determination under these circumstances, this Court is not required to give deference to the successor judge's determination. *Thompson v. Sawyer,* 678 F.2d 257 (D.C.Cir.1982). We believe this is the essence of this Court's opinion in *Hendricks.* On the other hand, where a successor judge is asked to reconsider a legal ruling of his unavailable predecessor, the successor judge is empowered to reconsider those issues to the same extent as his predecessor could have. *See United States Gypsum Co. v. Schiavo Bros., Inc.,* 668 F.2d 172 (3rd Cir. 1981), *cert. denied,* 456 U.S. 961, 102 S.Ct. 2038, 72 L.Ed.2d 485 (1982).

4. It is important to place the cases of *Young* and *Hendricks* in their proper procedural and historical contexts. *Hendricks* was decided prior to our adoption of the West Virginia Rules of Civil Pro-

Pursuant to Rule 59 of the West Virginia Rules of Civil Procedure, a circuit judge may grant a new trial "for any of the reasons for which new trials have heretofore been granted in actions at law." Essentially, Rule 59 merely restates the common law rule for new trials. Recently in Syllabus Point 3, in part, of *Asbestos Litigation, supra,* we refined our standard for appellate review of a circuit court's ruling on a motion for new trial:

> "When a trial judge vacates a jury verdict and awards a new trial pursuant to Rule 59 of the *West Virginia Rules of Civil Procedure,* the trial judge has the authority to weigh the evidence and consider the credibility of the witnesses. If the trial judge finds the verdict is against the clear weight of the evidence, is based on false evidence or will result in a miscarriage of justice, the trial judge may set aside the verdict, even if supported by substantial evidence, and grant a new trial. A trial judge's decision to award a new trial is not subject to appellate review unless the trial judge abuses his or her discretion."

*See also* Syl. pt. 2, in part, *Maynard v. Adkins,* 193 W.Va. 456, 457 S.E.2d 133 (1995) (" 'question of whether new trial should be granted by reason [of] counsel's possible violation' " of rules of Professional Responsibility is within the circuit court's discretion. (*citation omitted* )); *Cook v. Harris,* 159 W.Va. 641, 225 S.E.2d 676 (1976).

The case before us presents several issues containing mixed questions of fact and law. As we previously note, these issues require a somewhat nuanced standard of review. Appeals in West Virginia are usually arrayed along a degree-of-deference continuum, stretching from plenary review at one pole to highly deferential modes of review (*e.g.,* clear error, abuse of discretion) at the opposite pole. The standard of review we apply to mixed questions usually depends on where they fall along the degree-of-deference continuum: The more fact dominated the question, the more likely it is the trier's resolution of it will be accepted unless shown to be clearly erroneous.

Thus, the level of deference given to a successor judge's decision to grant a new trial based upon trial error varies with the circumstances of each case. We accord a trial judge's decision to grant a new trial on the basis of judge bias and prejudice and evidentiary and instructional errors substantial respect. However, as will be discussed *infra,* the "harmless error" rule cautions that reviewing courts have the obligation to ensure that a successor judge exercises "sound judgment" in granting new trial on the basis of trial error. This less deferential standard is particularly appropriate when the justification for the new trial concerns legal trial errors as opposed to insufficiency of evidence under Rule 59. The lower court must always temper the decision whether to grant a new trial because of trial error by considering the importance to the litigants of receiving a fair and final judgment with society's interest, as expressed through our Legislature, that unless error affected the outcome of the trial, a new trial should not usually be granted. In other words, when a trial court abuses its discretion and grants a new trial on an erroneous view of the law, a clearly erroneous assessment of the evidence, or on error that had no appreciable effect on the outcome, it is this Court's duty to reverse. We will discuss each assignment of error in turn.[5]

---

cedure and particularly Rule 63. Understandably, the Court in *Hendricks* did not undertake the analysis that we are now required to conduct in reviewing a successor judge's rulings on post-verdict motions. *Young,* on the other hand, did not involve a Rule 63 situation and for that reason is distinguishable. Prior to the adoption of the Judicial Reorganization Amendment the Circuit Court of Kanawha County, acting in its appellate capacity, was itself reviewing the decision made by the judge of the court of common pleas in *Young.* Thus, the circuit court lacked the authority of a "trial court" within the contemplation of Rule 52(a) and Rule 59 of the West Virginia Rules of Civil Procedure.

**5.** In addition to the assigned errors discussed *infra,* the defendants also contend the circuit court assigned different reasons for granting a new trial in its written order than those stated orally during the hearing on the post-trial motions. According to the defendants, the circuit court's oral ruling granting a new trial was based on the possibility that Judge Fox's presence may have created the appearance of impropriety and on the defendants' alleged violation of the pre-

## B.

### *Judicial Disqualification*

In the present case, Judge Fox was represented in his official capacity by one of defense counsel. Although defense counsel's representation of Judge Fox coincided with the representation of the defendants, both Judge Fox and defense counsel inadvertently failed to inform the plaintiffs until after the conclusion of the trial. It was only after Judge Fox received a letter from defense counsel summarizing actions taken on his behalf that he realized the potential conflict. Judge Fox then promptly informed the plaintiffs of the problem. Shortly thereafter, Judge Fox was permitted to recuse himself out of concern for the appearance of impropriety. We do not question Judge Fox's decision to recuse himself. In fact, we commend Judge Fox's flawless integrity and decision to staunchly uphold the principles of the Canons of the Code of Judicial Conduct in order to protect the judiciary from even a scintilla of doubt regarding impartiality.

Recognizing the failure to disclose the attorney-client relationship earlier in the proceedings was inadvertent, the successor judge nevertheless found "the plaintiffs had an absolute right to be notified of that conflict" and the late disclosure "calls into question the judicial process ... [and] ... any adverse ruling by ... [Judge Fox] then may be questioned by the litigants as possibly being unfair, although it probably was absolutely not unfair and was the correct ruling." We disagree with the successor judge that the "appearance of impropriety," without more, necessitates a new trial.

 The legal system will endure only so long as members of society continue to believe that our courts endeavor to provide untainted, unbiased forums in which justice may be found and done. The right to a fair and impartial trial is fundamental to a litigant; fundamental to the judiciary is the public's confidence in the impartiality of our judges and proceedings over which they preside. " '[J]ustice must satisfy the appearance of justice.' " *In re Murchison,* 349 U.S. 133, 136, 75 S.Ct. 623, 625, 99 L.Ed. 942, 946 (1955), *quoting Offutt v. United States,* 348 U.S. 11, 14, 75 S.Ct. 11, 13, 99 L.Ed. 11, 16 (1954). Thus, it is beyond peradventure that this Court possesses broad authority to preserve and protect the judiciary's essential functions.

In this vein, we have repeatedly expressed the importance of an impartial judiciary. *See State ex rel. Skinner v. Dostert,* 166 W.Va. 743, 750, 278 S.E.2d 624, 630 (1981) (courts have an obligation pursuant to Section 17 of Article 3 of the West Virginia Constitution "to apply the law and decide the case unfettered by any influences alien to the case or the process"). *See also State ex rel. Shrewsbury v. Poteet,* 157 W.Va. 540, 202 S.E.2d 628 (1974); *State ex rel. Moats v. Janco,* 154 W.Va. 887, 180 S.E.2d 74 (1971). Similarly, judicial judgment must be made free of " 'partisan interests, public clamor, or fear of criticism.' " *State ex rel. Skinner v. Dostert,* 166 W.Va. at 750, 278 S.E.2d at 630. (Citation omitted). Indeed, one of the most fundamental constitutional rights of a party under our judicial system is that he, she, or it is entitled to a fair judicial tribunal and that " ' "fairness requires an absence of actual bias or prejudice in the trial of a case." ' " *United States v. Wade,* 931 F.2d 300, 304 (5th Cir.), *cert. denied,* 502 U.S. 888, 112 S.Ct. 247, 116 L.Ed.2d 202 (1991). (Citations omitted).

---

trial *in limine* order prohibiting the introduction of evidence concerning the prior settlement. The defendants insist because the instructional error was not included as a ground for the new trial at the hearing, it is not part of the record and should be excluded from our consideration in assessing the legality of the new trial order.

As an initial matter, it is clear that where a circuit court's .written order conflicts with its oral statement, the written order controls. Therefore, "we are left to decide this case within the parameters of the circuit court's order."

*State v. White,* 188 W.Va. 534, 536 n. 2, 425 S.E.2d 210, 212 n. 2 (1992). *See also Harvey v. Harvey,* 171 W.Va. 237, 241, 298 S.E.2d 467, 471 (1982) ("[t]hat a court of record speaks only through its records or orders has been generally affirmed by this Court in subsequent cases"). Considering the above authority, we believe it is necessary to give greater credence to the circuit court's order. Thus, we find in this case that the defendants' concerns of the difference between the circuit court's ruling from the bench and the subsequent written order have no merit.

To protect against the appearance of impropriety, courts in this country consistently hold that a judge should disqualify himself or herself from any proceeding in which his or her impartiality might reasonably be questioned.[6] Again, we have repeatedly held that where " 'the circumstances offer a *possible* temptation to the average ... [person] as a judge not to hold the balance nice, clear and true' " between the parties, a judge should be recused. (citation omitted) (emphasis added). Syl. pt. 3, in part, *State ex rel. Brown v. Dietrick,* 191 W.Va. 169, 444 S.E.2d 47 (1994). (Emphasis added; citation omitted). *See also State v. Hodges,* 172 W.Va. 322, 305 S.E.2d 278 (1983); *Louk v. Haynes,* 159 W.Va. 482, 223 S.E.2d 780 (1976). In *Liljeberg v. Health Services Acquisition Corp.,* 486 U.S. 847, 860–61, 108 S.Ct. 2194, 2203, 100 L.Ed.2d 855, 872–73 (1988), the United States Supreme Court described the standard for recusal as whether a reasonable and objective person knowing all the facts would harbor doubts concerning the judge's impartiality. The Supreme Court stated: " 'The goal is to avoid even the appearance of partiality.' " *Liljeberg,* 486 U.S. at 860, 108 S.Ct. at 2203, 100 L.Ed.2d at 872. (Citation omitted). To be clear, avoiding the appearance of impropriety is as important in developing public confidence in our judicial system as avoiding impropriety itself.

Unquestionably, a judge should take appropriate action to withdraw from a case where he or she deems himself or herself biased or prejudiced.[7] Also important, however, is the rule that a judge has an equally strong duty to sit where there is no valid reason for recusal. *See Laird v. Tatum,* 409 U.S. 824, 93 S.Ct. 7, 34 L.Ed.2d 50 (1972) (Memorandum of Rehnquist, J.); *Stern Bros., Inc. v. McClure,* 160 W.Va. 567, 236 S.E.2d 222 (1977). In other words, while due consideration should be given to the notion that the administration of justice should be beyond the appearance of unfairness, a trial judge in deciding whether to recuse himself should also consider whether cases may be unfairly prejudiced or unduly delayed, or discontent may be created through unfounded charges of prejudice or unfairness made against the judge in the trial

**6.** The Code of Judicial Conduct requires that a judge maintain the integrity of the judiciary. At times, a judge's duty to the public requires a judge to disqualify himself or herself in numerous situations. Canon 2(A) provides: "A judge shall respect and comply with the law, shall avoid impropriety and the appearance of impropriety in all of the judge's activities, and shall act at all times in a manner that promotes public confidence in the integrity and impartiality of the judiciary." Furthermore, Canon 3(E)(1) reads, in pertinent part:

"*A judge shall disqualify himself or herself in a proceeding in which the judge's impartiality might reasonably be questioned,* including but not limited to instances where:

"(a) the judge has a personal bias or prejudice concerning a party or a party's lawyer, or personal knowledge of disputed evidentiary facts concerning the proceeding;

"(b) the judge served as a lawyer in the matter in controversy, or a lawyer with whom the judge previously practiced law served during the association as a lawyer concerning the matter, or the judge has been a material witness concerning it;

"(c) the judge knows that he or she, individually or as a fiduciary, or the judge's spouse, parent or child wherever residing, or any other member of the judge's family residing in the judge's household, has an economic interest in the subject matter in controversy or is a party to the proceeding or has any other more than

de minimis interest that could be substantially affected by the proceeding;

"(d) the judge or the judge's spouse, or a person within the third degree of relationship to either of them, or the spouse of such a person:

"(i) is a party to the proceeding, or an officer, director or trustee, of a party;

"(ii) is acting as a lawyer in the proceeding;

"(iii) is known by the judge to have a more than de minimis interest that could be substantially affected by the proceeding;

"(iv) is to the judge's knowledge likely to be a material witness in the proceeding." (Emphasis added).

**7.** The Commentary to Canon 3(E)(1) provides that a judge should timely disclose on the record information which the judge believes the parties or their lawyers might consider relevant to the question of disqualification. Both litigants and counsel should be able to rely upon judges complying with our Canons of Ethics. There is no obligation imposed on counsel to investigate the facts known by the judge that could possibly disqualify him. The judge is duty bound to disclose them *sua sponte.* "Such investigation, of course, would undermine public confidence in the judiciary and hinder, if not disrupt, the judicial process—all to the detriment of the fair administration of justice." *Porter v. Singletary,* 49 F.3d 1483, 1489 (11th Cir.1995).

of a cause. *See State v. Flint,* 171 W.Va. 676, 301 S.E.2d 765 (1983).

▮ Therefore, it must be emphasized that the standard for recusal is an objective standard. The objective standard is essential when the question involves appearance: "[W]e ask how things appear to the well-informed, thoughtful and objective observer, rather than the hypersensitive, cynical, and suspicious person." *U.S. v. Jordan,* 49 F.3d 152, 156 (5th Cir.1995).[8] *See also In re Mason,* 916 F.2d 384, 386 (7th Cir.1990). The objective standard requires a factual basis for questioning a judge's impartiality.[9]

**8.** Application of this standard will undoubtedly disqualify a trial judge who has no actual bias or prejudice and who would not be likely to weight the scales of justice against the complaining party. But to perform its high function in the best way "[j]ustice must satisfy the appearance of justice." *In re Murchison,* 349 U.S. at 136, 75 S.Ct. at 625, 99 L.Ed. at 946. (Citation omitted). Public respect for the judiciary demands this result. *In re Mason,* 916 F.2d at 386–87.

**9.** There are obvious problems with implementing this objective standard:

"Judges must ascertain how a reasonable person would react to the facts. Problematic is the fact that judges do not stand outside of the judicial system; they are intimately involved in the process of obtaining justice. Judges who are asked to recuse themselves are reluctant to impugn their own standards. Likewise, judges sitting in review of others do not like to cast aspersions. 'Yet drawing all inferences favorable to the honesty and care of the judge whose conduct has been questioned could collapse the appearance of impropriety standard ... into a demand for proof of actual impropriety.' ... Accordingly, we are mindful that an observer of our judicial system is less likely to credit judges' impartiality than the judiciary." *United States v. Jordan,* 49 F.3d at 156–57. (Citation omitted).

**10.** We reserve the question of whether recusal actually was necessary under these facts. However, as an appellate court, we have an obligation to provide circuit judges with some semblance of legal principles against which they may measure their conduct. Therefore, we acknowledge that it is unclear whether we would have held that Judge Fox's continued participation was error.

Modern authorities suggest that no disqualification is necessary where a judge is only being represented in his official capacity. *See* Jeffrey M. Shaman, Steven Lubet, and James J. Alfini, *Judicial Conduct and Ethics* § 5.18 at 134–35 (1990) ("[d]isqualification may not be required if the attorney before the judge has represented

▮ Because Judge Fox requested his own disqualification and recusal, we will assume, without deciding, that a reasonable person would have harbored doubts about his impartiality.[10] Thus, our next task under this assignment of error is to determine whether the remedy imposed by the successor judge was appropriate. We hold that a violation of the above recusal standard involving only the appearance of impropriety does not automatically require a new trial.[11] *See Liljeberg,* 486 U.S. at 862, 108 S.Ct. at 2203, 100 L.Ed.2d at 873 ("there is surely room for harmless error committed by busy judges who inadvertently overlook a disqualifying circumstance")[12]; *U.S. v. Jordan,* 49

him or her on the basis of the judge's official acts"). If the disqualification of every judge who is sued in his or her official capacity was required, it would have a substantial impact on available judicial resources. It must be noted that nearly every petition for a writ of prohibition brought to this Court has the unfortunate consequence of naming the judge as a party and the judge is obliged to obtain personal counsel or leave his defense to one of the litigants appearing before him. *See State ex rel. John Doe v. Troisi,* 194 W.Va. 28, 32 n. 4, 459 S.E.2d 139, 143 n. 4 (1995). This is particularly true when a writ of prohibition is sought on an interlocutory ruling. Should the mere fact that one of the litigants arguing on behalf of the judge have the consequence of disqualifying the judge from further participation in the case once the prohibition issue has been resolved? We think not and, for reasons discussed, *infra,* we refuse to adopt a *per se* recusal rule. Taking this argument one step further, any lawyer who argues in support of a trial judge's rulings on appeal would disqualify the trial judge from participating in any future cases in which the lawyer appears.

**11.** *De novo* review is appropriate even though we review the "appearance of impropriety" allegation in the context of a motion for new trial. As we stated earlier, the standard for appellate review of a circuit court's decision whether to grant a Rule 59 motion for a new trial is an abuse of discretion. When the circuit court's ruling hinges on its view of the law, however, its decision is subject to *de novo* review. *See Munn v. Algee,* 924 F.2d 568, 575 (5th Cir.), *cert. denied,* 502 U.S. 900, 112 S.Ct. 277, 116 L.Ed.2d 229 (1991).

**12.** *See Liljeberg, supra* (suggesting that even on the egregious facts of the case, disclosure and selection of a new judge resolved questions about impartiality and affirming vacatur in the case because the rights of one of the parties were greatly prejudiced). *See also United States v. Wade, supra* (stating that, even if a judge meets

F.3d at 158 (holding that "violation of [28 U.S.C.] ... 455(a) [which governs disqualification of judges for the appearance of impropriety] does not automatically require a new trial").

We agree with the successor judge that a breach of our disqualification standards "calls into question the judicial process" and that the plaintiffs had an absolute right to disclosure; however, these rights, even when violated, do not automatically translate into a right to a new trial. Affirming the successor judge's ruling granting a new trial would create a *per se* rule that a new trial should be granted each time there is merely an appearance of impropriety without any additional supporting evidence indicating actual prejudice or bias. The reasoning of the successor judge flies directly in the teeth of the proposition that evidence of actual bias or prejudice must be presented and, in the bargain, contradicts the .plain language of our harmless error rules and directly conflicts with

our prior case law that new trials should be granted only in rare cases. Thus, a claim that there is a sense of unfairness about the trial is not enough to justify a new trial.

■ Under our legislative and rule mandates, we are not permitted to grant new trials on the basis of ethical considerations. Rather, we must ask whether the trial court's rulings, decisions, and actions have erroneously and adversely affected the substantial rights of the parties. *See* W.Va.R.E. 103(a) [13]; W.Va.R.Civ.P. 61 [14]; W.Va.Code, 58-1-2 (1972) [15]; W.Va.Code, 58-1-3 (1923).[16] Disqualification under our recusal standards "is designed for the benefit of the judicial system, and even if a judge errs in failing to recuse ... [himself], the error does not necessarily call into question the decisions of the court." *United States v. Jordan,* 49 F.3d at 158. In other words, a claim of an appearance of impropriety does not rise to the level

---

the recusal standard test, this fact alone may not be sufficient for ordering a new trial); *United States v. Couch,* 896 F.2d 78 (5th Cir.1990) (holding that the appellant's claim of an appearance of impropriety does not rise to the level of a fundamental defect requiring a new trial).

**13.** Rule 103(a) reads, in pertinent part: *"Effect of Erroneous Ruling.*—Error may not be predicated upon a ruling which admits or excludes evidence unless a substantial right of the party is affected[.]"*

**14.** Rule 61 reads as follows:
"**Harmless Error.** No error in either the admission or the exclusion of evidence and no error or defect in any ruling or order or in anything done or omitted by the court or by any of the parties is ground for granting a new trial or for setting aside a verdict or for vacating, modifying or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice. The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties."

**15.** W.Va.Code, 58-1-2, reads as follows:
"No judgment or decree shall be arrested or reversed for the appearance of either party, being under the age of eighteen years, by attorney, if the verdict (where there is one), or the judgment or decree, be for him and not to his prejudice; or because it does not appear that an issue has been made up on matter alleged in any pleading when, without objection by any

party, the case has been tried in the absence of such issue and it is apparent from the record and the evidence (a) that the trial was conducted as if an issue had been made upon such matter, or (b) that no evidence pertaining to such matter was offered and it is reasonably apparent that the parties have treated such matter as waived or abandoned; or for any informality in the entry of the judgment or decree by the clerk; or for the omission of the name of any juror; or because it may not appear that the verdict was rendered by the number of jurors required by law; or any defect, imperfection, or omission in the pleadings, which could not be properly regarded on any motion under rule twelve of the West Virginia rules of civil procedure for trial courts of record, or on a demurrer in any case in which a demurrer is appropriate."

**16.** W.Va.Code, 58-1-3, reads:

"No decree shall be reversed for want of a replication to the answer, where the defendant has taken depositions as if there had been a replication; and when it appears that there was a full and fair hearing on the merits, and that substantial justice has been done, a decree shall not be reversed for want of a replication, although the defendant may not have taken depositions; nor shall a decree be reversed at the instance of a party who has taken depositions, for an informality in the proceedings, when it appears that there was a full and fair hearing on the merits, and that substantial justice has been done."

of a fundamental defect in due process requiring a new trial.[17]

We have reached a similar conclusion when reviewing an attorney's unethical behavior. In *Maynard v. Adkins, supra,* we suggested that an attorney's conflict of interest did not control our determination of trial errors: "It must be kept in mind that the action before us is not an ethics proceeding. Although issues concerning legal ethics are intertwined herein, this action is an appeal from the granting of a new trial under *W.Va.R.Civ.P.* 59." 193 W.Va. at 459–60, 457 S.E.2d at 135–36. The present case concerns possible judicial impropriety instead of an attorney's conflict of interest. However, as stated in *Maynard,* while ethical considerations are important, they do not change or lessen the requirements for a new trial.[18]

Under West Virginia law, when substantial rights are not affected, reversal is not appropriate. A party is entitled to a new trial only if there is a reasonable probability that the jury's verdict was affected or influenced by trial error. Accordingly, we hold that absent a showing of bias or prejudice, a new trial is unwarranted when (1) there has been a full trial on the merits, (2) there is no obvious error during the original proceedings, (3) the record shows it is extremely unlikely that prejudice could have affected the trial, and (4) the failure to disclose facts leading to a disqualification motion was inadvertent.

It is vital to the rule of law that legislative commands be honored, so long as they are constitutionally appropriate. Courts are not at liberty to disregard lawful directives of the Legislature simply because those directives conflict with our notions of fairness. In the last analysis, it is crucial to public confidence in the courts that judges be seen as enforcing the law and as obeying it themselves. This principle applies with full force to the "statutory harmless" error rule which, in substance, is a command to the judges of this State. Constitutional defects aside, "when ... the legislative trumpet sounds clearly, courts are duty bound to honor the clarion call." *United States v. Jackson,* 30 F.3d 199, 204 (1st Cir.1994).

Although the successor judge understandably was concerned with judicial impropriety, he failed to require the plaintiffs to make a showing of actual bias or prejudice.[19] When a party argues that a judge is disqualified from a case because of bias or prejudice, the party bears the burden of proving the disqualifying facts and demonstrating how his or her rights to a fair trial were prejudiced. "[I]t is critically important in a case of this kind to identify the facts that

**17.** We believe it is important to underscore a significant point. If, in fact, the plaintiffs had demonstrated "actual bias" by the trial court, this defect could not be overlooked on grounds of harmlessness. *See generally Sullivan v. Louisiana,* — U.S. —, —, 113 S.Ct. 2078, 2081–83, 124 L.Ed.2d 182, 189–91 (1993) (finding that the denial of certain fundamental rights which would necessarily have unquantifiable and indeterminate "consequences are 'structural defects in the constitution of the trial mechanism ... [and] defy analysis by "harmless-error· standards[.]" (Citation omitted)). Such a situation involves the denial of the most fundamental constituents of due process—so fundamental that any judgment in its absence is indecent even if the complaining litigant has no case whatsoever. On the other hand, "[t]he right to a judge who is free from the mere *appearance* of partiality is not part of due process at all, let alone a fundamental part." *Tyson v. Trigg,* 50 F.3d 436, 442 (7th Cir.1995). (Emphasis in original).

**18.** The successor judge failed to acknowledge the ameliorating effect a judge's disqualification

could have on the judicial process. In the interest of economy and fairness to all parties, a mere inadvertence on the part of a trial judge should be alleviated by the admittance of the problem, his or her recusal, and a successor judge reviewing the case for evidence of bias or prejudice. We also agree with the United States Supreme Court in *Liljeberg v. Health Services Acquisition Corp.,* 486 U.S. at 866, 108 S.Ct. at 2206, 100 L.Ed.2d at 876, that "[a] full disclosure at ... [the time of the impropriety] would have completely removed any basis for questioning the judge's impartiality and would have made it possible for a different judge to decide whether the interests—and appearance—of justice would have been served by a retrial." As suggested in *Liljeberg,* impartiality can be alleviated by recusal.

**19.** Unlike most litigants, the plaintiffs have had the benefit of two reviewing courts, both of whom have had the opportunity to review the record. Additionally, neither below nor on appeal have the plaintiffs pointed to even one instance of bias or prejudice on the part of Judge Fox.

might reasonably cause an objective observer to question ... [a judge's] impartiality." *Liljeberg,* 486 U.S. at 865, 108 S.Ct. at 2205, 100 L.Ed.2d at 875. "Because of the presumption of regularity attendant on trial court proceedings," prejudice will not be presumed from a barren record. *State v. Trail,* 174 W.Va. 656, 660, 328 S.E.2d 671, 675 (1985). Therefore, the jury verdict in this case will be reinstated if, after a full review of the facts and issues presented, we conclude no reversible trial error was committed. Because we find no error based solely on the appearance of impropriety in this case, we must now decide whether error of any such magnitude was committed justifying the setting aside of the jury's verdict.

### C.

#### In Limine Motion

The second basis for the successor judge's granting of a new trial is the defendants' violation of the pretrial order prohibiting disclosure of any evidence concerning the plaintiffs' prior settlement with the Cleveland Clinic. The defendants argue: (1) the plaintiffs "opened the door" to such discussion, and (2) the plaintiffs failed to object to the defendants' questions on the settlement. The plaintiffs assert they were not required to raise an objection at trial and any attempt to do so would have caused the jury to place undue emphasis on the tainted evidence.

The plaintiffs assert the defendants breached the pretrial order restriction when the following exchange took place between defense counsel and Mrs. Tennant:

"[Defense counsel:] And am I not correct that you continued to see and use the facilities at the Marion Health Care Hospital until you and your husband decided to bring a lawsuit?

"[Mrs. Tennant:] That's correct.

"[Defense counsel:] And am I correct that the first lawsuit you brought was a lawsuit against the Cleveland Clinic?

"[Mrs. Tennant:] Yes.

"[Defense counsel:] And am I correct that the lawyers that you used in that process or procedure are the same lawyers that you have at the present time?

"[Mrs. Tennant:] That's correct.

"[Defense counsel:] And am I correct that the lawsuit concluded without trial but with settlement?

"[Mrs. Tennant:] That's correct."

As noted by the defendants, the plaintiffs did not object during or after this line of questioning. Additionally, there is no evidence the plaintiffs requested an instruction be given to the jury. Under this assignment, we are required to address specific areas of evidence law regarding motions *in limine* (a Latin phrase which means "at the threshold"). First, we must determine the proper procedure to be followed when the party opposing the *in limine* order believes the "door" to the prohibited evidence has been opened at trial. Second, where a motion *in limine* order has been deliberately violated, we must determine when a reversal of a verdict in favor of the party violating the order is required.

We begin with a discussion of the role and purpose of motions *in limine.* Certain types of exclusionary rulings in civil cases are commonly made before trial, such as rulings on the admissibility of settlement evidence. In most cases, judges are hesitant to rule finally on evidentiary questions in advance of trial. The role and importance of the disputed evidence, its fit with the other evidence in the case, and even the precise nature of the evidence may all be affected by, or at least clearly understood within, the context of the trial itself.

At the same time, determining the admissibility of a piece of evidence may sometimes require a potentially lengthy factual inquiry (*i.e.,* whether a new class of scientific evidence is admissible). Thus, the utility of a pretrial motion *in limine* is that

"it can settle evidentiary disputes in advance without interrupting an ongoing trial to entertain arguments (even briefs) on complicated points and without the inevitable risk that objecting and deciding evidence questions will themselves convey to the jury the substance of the matter in question, or subject the parties to risks of adverse jury reaction because of the con-

tentious nature of evidentiary argument." Christopher B. Mueller & Laird C. Kirkpatrick, *Evidence* § 1.6 at 23 (1995).

The entire structure of the case, the parties' preparations, and the trial court's preparation of the jury charge may turn on whether a central piece of evidence is admitted. Thus, while caution needs to be exercised, trial judges have discretion to make purportedly final advance rulings to admit or exclude evidence. We say "purportedly" because judges in ongoing proceedings normally have some latitude to revisit their own earlier rulings. *See Luce v. United States,* 469 U.S. 38, 41–42, 105 S.Ct. 460, 463, 83 L.Ed.2d 443, 448 (1984) ("even if nothing unexpected happens" trial court may "alter a previous *in limine* ruling").

In this case, neither side disputes the fact that the circuit court was entitled to rule *in limine* on the evidence in controversy pursuant to Rule 103(c) of the West Virginia Rules of Evidence.[20] Nor is there any challenge to the correctness of the circuit court's ruling *in limine.* Rather, the defendants state that once the door was opened by the plaintiffs, the defendants had every right to rebut the evidence, even if the rebuttal evidence had been declared inadmissible at a pretrial hearing. We strongly disagree.

 Once a trial judge rules on a motion *in limine,* that ruling becomes the law of the case unless modified by a subsequent ruling of the court. Like any other order of a trial court, *in limine* orders are to be scrupulously honored and obeyed by the litigants, witnesses, and counsel. It would entirely defeat the purpose of the motion and impede the administration of justice to suggest that a party unilaterally may assume for himself the authority to determine when and under what circumstances an order is no longer effective. A party who violates a motion *in limine* is subject to all sanctions legally available to a trial court, including contempt, when a trial court's evidentiary order is disobeyed.[21] To be clear, the only participant not bound by the *in limine* ruling is the trial court. A trial court is vested with the exclusive authority to determine when and to what extent an *in limine* order is to be modified.

 We have not had occasion to address the specific protocol that should be followed when a litigant believes that a change of circumstances has "opened the door" to the introduction of the very evidence that is forbidden in the *in limine* order. When these circumstances present themselves, the party wishing to introduce the evidence is obligated under Rule 103(c) to request an *in camera* hearing out of the presence of the jury.[22] At that time, the party may request a modification of the order. If the trial court permits such a modification, the modified order becomes the law of the case and the parties are required to act accordingly. Had this procedure been followed in this case, the issue we are addressing would not be before this Court.

 The plaintiffs seize upon the defendants' violation as their grounds for urging us to affirm the granting of a new trial. "Having refused to hunt with the hounds, we

---

**20.** Rule 103(c) reads as follows:

"In jury cases, proceedings shall be conducted, to the extent practicable, so as to prevent inadmissible evidence from being suggested to the jury by any means, such as making statements or offers of proof or asking questions in the hearing of the jury. Where practicable, these matters should be determined upon a pretrial motion in limine."

**21.** It is not clear whether the successor judge was indeed exercising supervisory authority over the conduct of the attorney when he relied upon the *in limine* issue to set aside the verdict. It is well established that "[o]rdinarily the control of attorneys' conduct in trial litigation is within the supervisory powers of the trial judge," and is thus a matter of judicial discretion. *Redd v. Shell Oil Co.,* 518 F.2d 311, 314 (10th Cir.1975). We will not disturb a trial court's findings regarding attorney conduct unless there is no reasonable basis to support those findings. *See SLC Ltd. v. Bradford Group West, Inc.,* 999 F.2d 464, 466 (10th Cir.1993). However, we review *de novo* a trial court's interpretation of the applicable law that governs its decision.

**22.** See the text of Rule 103(c) of the Rules of Evidence in note 20, *supra,* mandating that, when practicable, these proceedings not be conducted within the hearing of the jury. Otherwise, the jury might become contaminated with tainted evidence that might require a mistrial or the imposition of other stringent and remedial measures.

**114**

likewise refuse to hold with the hare." *United States v. Muniz*, 49 F.3d 36, 41 (1st Cir.1995). To hold as the plaintiffs urge would erect another *per se* rule that is inconsistent with our prior precedent and, for that reason, we decline to do so. The case law in this jurisdiction establishes the rule that the failure to follow a trial judge's *in limine* ruling is not always reversible error. It is subject to a harmless error analysis. *See Ilosky v. Michelin Tire Corp.*, 172 W.Va. 435, 307 S.E.2d 603 (1983). In this case, the plaintiffs could have prevented the introduction of the evidence by a specific and timely objection. For strategical reasons, they decided not to do so. Rather, they argue that because of the *in limine* order they were not required to object and that an objection would have placed undue emphasis on the question and answer. We disagree. Simply stated, the plaintiffs cannot "squirrel" away objections, revealing them for the first time after an adverse verdict.

■ As a threshold matter, we think the plaintiffs seriously misconstrue the role of a motion *in limine* and their responsibility under Rule 103(a) of the West Virginia Rules of Evidence to preserve error for appellate review. We begin with the observation that had there been a timely objection to this line of questioning, it is unlikely the last question and answer would have been brought to the jury's attention. This is the paradigmatic case in which the plaintiffs gambled and lost by their failure to object. By failing to object, the plaintiffs failed to protect any rights they may have had to appeal the introduction of this evidence. Our jurisprudence clearly establishes the doctrine that preserving error is the responsibility of the parties. It is not the role of the trial judge to present evidence; nor is it his or her responsibility to exclude or limit evidence, as provided by evidence law, except insofar as the party opposing the evidence timely and specifically requests the trial judge to do so. To be clear, the party complaining on appeal of the admission of evidence bears sole responsibility for adequately preserving the record for meaningful appellate review. In this case, the responsible parties failed to meet this critical obligation.

■ As we stated previously: "[O]bjections on non-jurisdictional issues, must be made in the lower court to preserve such issues for appeal." *Loar v. Massey*, 164 W.Va. 155, 159, 261 S.E.2d 83, 86 (1979). Therefore, the

"' '' '[f]ailure to make timely and proper objection to remarks of counsel made in the presence of the jury, during the trial of a case, constitutes a ... [forfeiture] of the right to raise the question thereafter in the trial court or in the appellate court.' Point 6, Syllabus, *Yuncke v. Welker*, 128 W.Va. 299 [36 S.E.2d 410 (1945)]." Syllabus point 7, *State v. Cirullo*, 142 W.Va. 56, 93 S.E.2d 526 (1956).' Syl.Pt. 5, *State v. Davis*, 180 W.Va. 357, 376 S.E.2d 563 (1988)." Syllabus Point 1, *Daniel B. by Richard B. v. Ackerman*, 190 W.Va. 1, 435 S.E.2d 1 (1993).

*See also Estep v. Brewer*, 192 W.Va. 511, 453 S.E.2d 345 (1994); *O'Neal v. Peake Operating Co.*, 185 W.Va. 28, 404 S.E.2d 420 (1991).

■ Before leaving this subject, we note briefly that plaintiffs assert a rather broad reading of our decision in *Bennett v. 3 C Coal Co.*, 180 W.Va. 665, 379 S.E.2d 388 (1989). The plaintiffs cite *Bennett* for the proposition that they were not required to renew their objection "to preserve the record for appeal." Their reliance on *Bennett* is misplaced. In *Bennett*, the defendant made a specific objection to and received an *adverse ruling* on its objection to the plaintiff's comments during opening statements. We found the defendant in that case was not required to repeat the objection later to preserve the issue for appeal. In the present case, the plaintiffs made an *in limine* motion. However, unlike the plaintiff in *Bennett*, the plaintiffs received a *favorable* ruling, but failed to raise an objection even once it was clear the defendants were violating the *in limine* order. *Bennett*'s holding was designed to eliminate the requirement of repeating objections to preserve an issue for appeal only in the limited situation when a litigant has objected to and received an adverse ruling. We neither considered nor intended that this narrow proposition should be extended to include litigants who received a favorable ruling. Furthermore, we have consistently

stressed that litigants have a continuing obligation to draw the attention of the circuit court to the opposing party's violation of any favorable rulings. Extending *Bennett* would only serve to undermine trial court proceedings and the appeal process by permitting litigants to appeal on barren records when their trial court strategies fail to produce a desirable verdict. Thus, we refuse to relieve the plaintiffs of their duty to object in a timely manner by extending the narrow holding in *Bennett* to mean that making a motion *in limine* is sufficient to preserve for appeal any violation of the ruling *in limine*.

Similarly, we refuse to impose on the trial courts of this state a monitoring requirement after an *in limine* order has been entered. Counsel for litigants have the responsibility for bringing any violations to the court's attention. Without generalizing too broadly, it is normally the case that this kind of monitoring is the job of counsel and not an already burdened circuit judge. In *Waldron v. Waldron*, 73 W.Va. 311, 317, 80 S.E. 811, 814 (1913), we stated a trial judge engrossed in many matters and points pertaining to a case of the magnitude of this one should be aided by the vigilant assistance of counsel: "If a party who has made an objection permits it to be forgotten, a waiver should be chargeable to the party." The circumstances justifying an *in limine* ruling often will change at trial. Problems that can be treated with some confidence in context are often very difficult to solve before other pieces of the puzzle have been assembled. This, we have said, is why circuit courts are reluctant to decide evidentiary questions before trial. In any event, it was the circuit court's responsibility to enforce its pretrial orders, and absent unusual circumstances not now before us, the circuit court's failure to do so due to the failure of counsel to bring the issue to its attention does not furnish us with the basis of concluding the circuit court abused its discretion.

In this case, we need not evaluate whether the defendants breached the pretrial order or whether the plaintiffs "opened the door" to the discussion of the settlement because their failure to raise an objection to the defendants' questioning waived the issue for fur-

ther review. An objection would have given the trial court a chance to remedy any breach of the *in limine* order by striking testimony and instructing the jury to disregard it. Thus, the plaintiffs' failure to object as a part of their trial strategy even precludes our consideration of this alleged error under the plain error rule, *State v. Miller,* 194 W.Va. 3, 17–19, 459 S.E.2d 114, 128–130 (1995), and most definitely precludes the successor judge from using the plaintiffs' assertions as a basis for the granting of a new trial. Because the successor judge failed to acknowledge the fact that the plaintiffs did not object to the defendants' purported violations in a timely manner, we find the successor judge abused his discretion in ordering a new trial based on this error.

### D.

#### *Jury Instructions*

The third basis for the successor judge's order granting a new trial was that one of the jury instructions misstated the standard of care. The contested instruction reads as follows:

"A physician practicing in the field of family or general medicine is not required to possess or exercise the highest degree of learning—learning, care, and skill, and that under the law, in the treatment of Janet Tennant, Doctors Chidester and Endress were not required or bound to possess or exercise the highest degree of learning, care, and skill known to the medical profession, but in their treatment of Janet Tennant, *Doctors Chidester and Endress were only bound to possess and exercise that reasonable, ordinary, and average degree of learning, care, and skill which is possessed and exercised by the average doctor engaged in family or general medicine,* regard being had to the state of medical science in 1989, when Janet Tennant was seen by the defendants prior to her cancer surgery. The Court further instructs the jury that unless plaintiffs prove, by a preponderance of the evidence, that Doctors Chidester and Endress failed to exercise such reasonable, ordinary, and average learning care, or skill in the treatment of Janet Tennant, then your

verdict should be for the defendants." (Emphasis added).

The plaintiffs specifically object to the use and placement of the word "average" in the instruction. The defendants assert the language of the instruction is derived from Syllabus Point 2 of *Schroeder v. Adkins*, 149 W.Va. 400, 141 S.E.2d 352 (1965),[23] and the standard of care is still consistent with the language in the West Virginia Medical Professional Liability Act, W.Va.Code, 55–7B–1, *et seq.* However, the plaintiffs assert the word "average" understates the standard of care required under W.Va.Code, 55–7B–3 (1986).[24] The plaintiffs assert the statute does not include the word "average." Furthermore, even if the word "average" were permissible, the second usage of the word in the instruction ("skill which is possessed and exercised by the average doctor engaged in family or general medicine") permits the jury to infer that it is acceptable for doctors to practice average medicine instead of being held to the higher standard of the average members of the profession in good standing.

 This argument merits little discussion. The formulation of jury instructions is within the broad discretion of a circuit court, and a circuit court's giving of an instruction is reviewed under an abuse of discretion standard. A verdict should not be disturbed based on the formulation of the language of the jury instructions so long as the instructions given as a whole are accurate and fair to both parties.[25] Syllabus Point 6 of *Michael v. Sabado*, 192 W.Va. 585, 453 S.E.2d 419 (1994), states:

" ' " 'Instructions must be read as a whole, and if, when so read, it is apparent they could not have misled the jury, the verdict will not be disturbed, through [sic] one of said instructions which is not a binding instruction may have been susceptible of a doubtful construction while standing alone.' Syl. Pt. 3, *Lambert v. Great Atlantic & Pacific Tea Company*, 155 W.Va. 397, 184 S.E.2d 118 (1971)." Syllabus Point 2, *Roberts v. Stevens Clinic Hospital, Inc.*, 176 W.Va. 492, 345 S.E.2d 791 (1986).' Syllabus Point 3, *Lenox v. McCauley*, 188 W.Va. 203, 423 S.E.2d 606 (1992)."

In other words, the adequacy of the charge must be made in the context of the entire trial.

 We agree that the above jury instruction has the potential for confusing the jury by its somewhat convoluted nature and that it slightly misstated the standard of care language of W.Va.Code, 55–7B–3. However, in this case, we find the granting of a new trial was inappropriate because the plaintiffs were not prejudiced by the instruction. Other instructions describe the appropriate standard of care without using the word "average,"[26] and in combination with the instruc-

**23.** Syllabus Point 2 of *Schroeder* reads as follows:

"A chiropodist is not required to exercise the highest degree of skill and diligence possible in the treatment of an injury or disease, unless he has by special contract agreed to do so. In the absence of such special contract, he is required to exercise only such reasonable and ordinary skill and diligence as are ordinarily exercised by the average of the members of the profession in good standing in similar localities and in the same general line of practice, regard being had to the state of medical science at the time."

**24.** W.Va.Code, 55–7B–3 reads, in part:

"The following are necessary elements of proof that an injury or death resulted from the failure of a health care provider to follow the accepted standard of care:
"(a) The health care provider failed to exercise that degree of care, skill and learning required or expected of a reasonable, prudent health care provider in the profession or class to which the health care provider belongs acting in the same or similar circumstances[.]"

**25.** On appeal, the question of whether a jury has been properly instructed is to be determined not upon consideration of a single paragraph, sentence, phrase, or word, but upon the charge as a whole.

**26.** The pertinent portions of some of the other instructions addressing the standard of care read as follows:

"In West Virginia, a health care provider is negligent if she fails to exercise such *reasonable and ordinary skill, care—skill, care, diligence, and learning as are ordinarily exercised by prudent members of the profession in the same general line of practice* in which the health care provider belongs, acting in the

tion in question should have eliminated any question the jury might have had about the proper standard of care.

■ We repeat here that due to the risk of misleading the jury, a circuit court should refrain wherever possible from gratuitously adding language to its charge that is not an element of the claim or defense and that can better be presented to the jury by way of closing argument. Despite this admonition, we need not reverse this verdict. Our review of the entire charge convinces us that any confusion engendered by the inappropriate reference to "average" was offset by the circuit court's careful and clear discussion of the burden of proof. These instructions were adequate to ensure that the jury was informed as to its responsibilities and as to the substantive law standards in this case. Thus, we are unconvinced that the use of the word "average" in this single instruction is such a substantial departure from the legislative intent for the standard of care announced under W.Va.Code, 55–7B–3, that granting a new trial was merited. Although the contested instruction standing alone is "susceptible of a doubtful construction," other instructions read to the jury eliminated any potentially prejudicial effect.

> same or similar circumstances, with due regard given to the state of medical science at the time of the alleged negligence.
>
> \* \* \* \* \* \*
>
> "Negligence in this case is the failure to exercise that *degree of care, skill, and learning required or expected of a reasonably prudent family practitioner in the same or similar circumstances* in which Doctors Chidester and Endress found themselves in their care and treatment of Janet Tennant in 1989. In this case, an act of negligence on the part of those physicians may be referred to as a deviation from the standard of care. Therefore, in this case, negligence may be the performance of an act which a reasonably prudent family practitioner in the same or similar circumstances would not do, or it may be the failure to perform as would a reasonably prudent family practitioner in the same or similar circumstances." (Emphasis added).

27. Additionally, the defendants argue that, even if all three errors are considered valid, none of the errors by themselves are sufficient to justify a new trial.

Thus, we can find no reversible error in the jury charge. Therefore, the successor judge abused his discretion by granting a new trial based on defects in the disputed instruction.

### E.

*Applicability of the Cumulative Error Rule*

Lastly, the plaintiffs contend, assuming *arguendo,* that while the alleged errors individually did not amount to reversible error, the errors cumulatively were sufficient to justify the granting of a new trial. On the other hand, the defendants argue the successor judge erred in applying the criminal law "cumulative error" doctrine in a civil case. As to both points, we disagree.[27]

■ The cumulative error doctrine was created to permit courts to reverse "[w]here there are numerous violations of fundamental rules that, if considered individually, would probably have no measurable effect on the court but, in cumulative effect, … are prejudicial[.]" I Franklin D. Cleckley, *Handbook on West Virginia Evidence* § 1–7(B)(5) at 48 (1994). The doctrine was designed to provide relief to a party when the combination of errors that are insignificant by themselves prevented the party from receiving a fair trial.[28] *See* Syl. pt. 5, in part,

28. In civil as well as criminal cases, the right to a fair trial is fundamental. *See, e.g., In re International Business Machines Corp.,* 618 F.2d 923, 932 n. 11 (2nd Cir.1980); *Bailey v. Systems Innovation, Inc.,* 852 F.2d 93, 98 (3rd Cir.1988) ("fairness in a jury trial, whether criminal or civil in nature, is a vital constitutional right"). To be specific, "the right to a fair trial is guaranteed by the Sixth Amendment [to the United States Constitution and Section 14 of Article III of the West Virginia Constitution] to criminal defendants and to all persons by the Due Process Clause of the Fourteenth Amendment" of the United States Constitution and Section 10 of Article III of the West Virginia Constitution. *Chicago Council of Lawyers v. Bauer,* 522 F.2d 242, 248 (7th Cir.1975), *cert. denied sub nom. Cunningham v. Chicago Council of Lawyers,* 427 U.S. 912, 96 S.Ct. 3201, 49 L.Ed.2d 1204 (1976). In either type of case, the court must be alert to avoid even harmless, erroneous rulings that when considered together may undermine the fairness of the factfinding process. Consistent commission of erroneous rulings may well deprive an aggrieved litigant of due process unless the cumulative effect of the errors does not affect the outcome of trial.

118

*State v. Walker,* 188 W.Va. 661, 425 S.E.2d 616 (1992) (" '[w]here the record of a criminal trial shows that the cumulative effect of numerous errors committed during the trial prevented the defendant from receiving a fair trial, his conviction should be set aside, even though any one of such errors standing alone would be harmless error.' " (citation omitted)). Although we noted in *Riggle v. Allied Chemical Corp.,* 180 W.Va. 561, 378 S.E.2d 282 (1989), that we had never applied the cumulative error doctrine to civil proceedings, nothing in that opinion or in the nature and purpose of the cumulative error doctrine forecloses the future application of the doctrine to civil cases.

■ Therefore, we hold that the cumulative error doctrine may be applied in a civil case when it is apparent that justice requires a reversal of a judgment because the presence of several seemingly inconsequential errors has made any resulting judgment inherently unreliable.

■ Although we recognize that the cumulative error doctrine may be used by a circuit court in situations where there are numerous "harmless" errors, as we have frequently noted, the doctrine should be used sparingly. Furthermore, "if the errors ... are insignificant and inconsequential, the case should not be reversed under this rule." I Franklin D. Cleckley, *Handbook on Evidence* § 1–7(B)(5) at 49. Additionally, the doctrine can only be applied if there are some errors in the record. *See State v. Carrico,* 189 W.Va. 40, 427 S.E.2d 474 (1993) (cumulative error doctrine is inapplicable where no errors are present); *State v. Clements,* 175 W.Va. 463, 334 S.E.2d 600, *cert. denied,* 474 U.S. 857, 106 S.Ct. 165, 88 L.Ed.2d 137 (1985). As a general rule, we hold that the cumulative error doctrine may be considered and applied when evaluating a party's claim of trial error. However, as discussed above, the successor judge did err in using the doctrine in this case. We find as a matter of law that the conduct and errors relied upon by the successor judge were insufficient alone or in combination to justify setting aside the jury's verdict.

III.

CONCLUSION

After a thorough review of the record, we are convinced the jury's verdict must be reinstated. First, the plaintiffs do not contend that Judge Fox was actually biased during the trial phase nor do they allege an explicit nexus between the alleged errors and the appearance of impropriety or bias. Second, the plaintiffs failed to allege or prove any harm whatsoever during the trial because of any alleged bias or prejudice. Third, we find neither an indication of bias in the trial record nor any error requiring reversal. For the foregoing reasons, the judgment of the Circuit Court of Marion County is reversed and the jury verdict is ordered reinstated.

Reversed.